Barry W. JACKSON and Thomas E. Fenton, Plaintiffs,

v.

The UNITED STATES of America; The Alaska Federation of Natives, Inc., an Alaskan corporation; Doyon, Limited; Aleut Corporation; Arctic Slope Regional Corporation; Calista Corporation; Bering Straits Native Corporation; Bristol Bay Native Corporation; Chugach Native Incorporated; Cook Inlet Region Incorporated; Ahtna Incorporated; Koniag Incorporated; Nana Regional Corporation, Inc.; Sealaska Corporation; and The 13th Regional Corporation, all Alaska Corporations; Tanana Chiefs Conference; The Native Village of Minto; The Natives of Nenana; The Native Village of Tanacross; Eagle Village; The Native Village of Tetlin; The Northway Tribe of Indians; The Arctic Village; The Native Village of Venetie; The Fairbanks Native Association, Defendants.

No. F 77–35 Civil.

United States District Court, D. Alaska.

Jan. 31, 1980.

Edward Weinberg, Frederick L. Miller, Philip L. Chabot, Duncan, Brown, Weinberg & Palmer, P.C., Washington, D. C., James Linxwiler, Anchorage, Alaska, for Koniag, Inc.

Donald J. Beighle, Sealaska Corp., Juneau, Alaska, Michael M. Holmes, Juneau, Alaska, for Sealaska Corp.

David Wolf, Anchorage, Alaska, for Alaska Federation of Natives.

David Waters, Atty., Dept. of Justice, Washington, D. C., for United States.

### MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

POOLE, District Judge.

This action, which the complaint declares "lies exclusively in contract," arises out of eleven attorney-client agreements, some oral, some written, which are alleged to have been entered into between the plaintiffs, who are Alaska attorneys, and several Alaskan Native Villages and Regional Associations between the years 1967 and 1969. Plaintiffs claim to have rendered professional services entitling them to "equitable" compensation in connection with the passage of the Alaska Native Claims Settlement Act ("ANCSA" or "the Act"), P.L. 92–203, § 2, et seq., December 18, 1971, 43 U.S.C. § 1601, et seq. Pursuant to the long-standing provisions of 25 U.S.C. § 81, which requires that the Secretary of the Interior approve all contracts entered into with Indian Tribes, plaintiffs submitted six of the eleven contracts for the Secretary's approval. The Secretary approved three (involving the villages of Minto, Tanacross and Nenana) and disapproved the other three (involving the villages of Tetlin, Eagle and Northway). Plaintiffs thereupon declined to submit the remaining five agreements which involved the Alaska Federation of Natives, the Tanana Chiefs Conference, the Fairbanks Native Association, and the villages Venetie and Arctic Village. The latter five contracts therefore never received consideration by the Secretary.

Frederick Paul, Paul, Johnson, Paul & Riley, Seattle, Wash., Barry W. Jackson, Fairbanks, Alaska, for plaintiffs.

Arthur Lazarus, Washington, D. C., William H. Timme, Fairbanks, Alaska, for Doyon, Ltd. and Bristol Bay Native Corp.

James Linxwiler, Anchorage, Alaska, for Cook Inlet Region, Inc.

Sheila Gallagher, Anchorage, Alaska, David Wolf, Anchorage, Alaska, for Bering Straits Native Corp.

Robert M. Goldberg, Anchorage, Alaska, for Ahtna, Inc.

Gary Thurlow, Croft & Thurlow, Anchorage, Alaska, for Aleut Corp.

James F. Wickwire, Wickwire, Lewis, Goldmark, Dystel & Schorr, Seattle, Wash., Edward A. Merdes, Merdes, Schaible, Staley & DeLisio, Fairbanks, Alaska, for Arctic Slope Regional Corp.

Carol A. Johnson, Birch, Horton, Bittner & Monroe, Anchorage, Alaska, for Calista Corp.

Joseph P. Josephson, Josephson & Trickery, Inc., Anchorage, Alaska, David J. Walsh, Moderow, Walsh, Johnson & James, Anchorage, Alaska, for Chucagh Natives, Inc.

By the passage of the Act in 1971, Congress intended to settle all aboriginal land claims and associated rights of Alaskan natives and native groups. The legislation provided for the Organization of Village Corporations to receive the lands and benefits for which they were eligible (Section 1607). It established twelve geographic regions covering the then existing twelve native associations (Section 1606(a)). It also authorized a thirteenth region for natives who were nonresidents of Alaska (Section 1606(c)). In its final form, the Act included a provision establishing an Alaska Native Fund of $2,000,000 for compensating the attorneys and consultants who had rendered services in connection with the passage of the statute. 43 U.S.C. § 1619. It established also a procedure requiring that claims for attorneys' and consultants' fees be filed with the Chief Commissioner of the Court of Claims not later than December 18, 1972, and for the Chief Commissioner to determine the amount payable to each claimant out of the Alaska Native Fund (the Fund). Specific provisions were inserted that no compensation in addition to that paid from the Fund could be received by any attorney or consultant who filed, or who could have filed, a claim under the Act, and that any contract or agreement to the contrary would be void. 43 U.S.C. §§ 1619(c), (d), and (f). Pursuant to these provisions, the plaintiffs and others filed claims for attorneys' fees with the Court of Claims. On April 15, 1975, plaintiffs were awarded the sum of $130,082 out of the Fund. Because the aggregate amount of all claims for attorneys' fees exceeded the $2,000,000 allocated to the Fund, the plaintiffs were not compensated to the full extent of their claims. As is set forth below, all plaintiffs joined in a stipulation that each would receive a pro rata award from the Fund.

Plaintiffs were dissatisfied with the compensation paid to them. They had been unhappy from the beginning since the Secretary of the Interior had announced even before the Act was passed that only hourly rate contracts would be approved. They filed this action in order to obtain additional fees for those services for which they did not receive compensation from the Fund. They seek declaratory judgments that their contracts with the native villages and regional associations are valid, and that the Fund is subject to liability under those contracts. Their theory of liability of the newly constituted native villages and associations seems to be that given the reorganization brought about by the Act, for the purposes of receiving benefits and of representation in the Fund, the regional corporations are suable under the "common fund" theory as beneficiaries of the Fund. No affirmative relief is sought against the corporations (except as to Doyon, which is said to constitute a "de facto present successor" to the interests and liabilities of plaintiffs' direct clients). The corporations are joined as indispensable, or at least as proper, parties since their interests in the Fund stand to be diminished to the extent of plaintiffs' success in holding the Fund liable for the unpaid balance of their fees. Plaintiffs also seek judicial review by the Court of the Secretary's action in disapproving the contracts with the villages of Tetlin, Eagle and Northway, and they ask for a writ of mandamus to require the Secretary to determine an "equitable" fee for plaintiffs' services rendered under the contracts. Finally, they seek a declaratory judgment that to the extent that 25 U.S.C. § 81 requires the Secretary to approve all contracts with Indian Tribes, it is unconstitutional both on its face and as applied in this case.

Federal jurisdiction is claimed to exist based on Federal Question Jurisdiction, 28 U.S.C. § 1331; the Administrative Procedure Act, 5 U.S.C. §§ 702 and 703; the Declaratory Judgment Act, 28 U.S.C. § 2201; and from 28 U.S.C. § 1361, conferring jurisdiction in mandamus.

Defendant Calista Corporation has moved to dismiss the action for lack of subject matter jurisdiction. The other defendants have joined in the motion. The several grounds of the motion will be discussed in turn.

## FEDERAL QUESTION JURISDICTION UNDER 25 U.S.C. § 81

Plaintiffs ask the Court to declare that their attorney-client contracts with the de-

fendant Alaskan Villages and Associations are enforceable and payable. They assert that the district court has jurisdiction because their claim "arises under" the laws of the United States within the meaning of 28 U.S.C. § 1331(a). They reason that since 25 U.S.C. § 81 requires the Secretary to approve such contracts before they can be enforced, that approval is a necessary element of their claim for attorneys' fees and hence their cause of action "arises" under 25 U.S.C. § 81.

■ In fact, however, plaintiffs place no reliance on 25 U.S.C. § 81 in seeking to enforce their contracts. Theirs is nothing more than a common law contract claim. Plaintiffs do anticipate that the defendants may raise the issue of the Secretary's disapproval of the contracts as a defense to the common law contract claim. It is now settled law that anticipated defenses which themselves stem from federal law, do not provide a sufficient basis to the plaintiff for initial federal jurisdiction. *Phillips Petroleum Co. v. Texaco, Inc.*, 415 U.S. 125, 128, 94 S.Ct. 1002, 1003, 39 L.Ed.2d 209 (1974); *Louisville and Nashville RR v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908).

■ Plaintiffs' claim for "equitable" compensation arises under general state contract law, express or *quantum meruit*; because the statute in question does not create the cause of action. In order for federal question jurisdiction to exist, the federal law must be a direct element of the plaintiffs' claim. It is not enough that it comes in remotely or indirectly. A decision often relied on in determining the existence of federal question jurisdiction is *Gully v. First National Bank in Meridian*, 299 U.S. 109, 112, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1936). In that case, Gully, the State Tax Collector of Mississippi, sued a national bank to collect state taxes claimed to be due. Under federal law, national banks were immune from state taxation *except* to the extent that Congress by statute had allowed them to be taxed. Accordingly, the bank had the action removed from the state to the federal court on the contention that the power to levy taxes upon national banks arose from the provisions of the federal statute and that by necessary implication, a plaintiff

must count upon the statute in suing for the tax. Mr. Justice Cardozo pointed out some of the elements which must be present for a case to arise "under the Constitution or laws of the United States." To come within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. 299 U.S. at 112, 57 S.Ct. at 97. A genuine and present controversy, not merely a possible or conjectural one, must exist with reference thereto, and the controversy must be disclosed upon the face of the complaint, unaided by the answer. "Indeed, the complaint itself will not avail as a basis of jurisdiction insofar as it goes beyond a statement of the plaintiff's cause of action and anticipates or replies to a probable defense." *Id.* at 113, 57 S.Ct. at 98. The opinion concluded that the removal from the state court in that case had been improper, because no federal question existed:

"The argument for the respondent proceeds on the assumption that because permission at times is preliminary to action the two are to be classed as one. But the assumption will not stand. A suit does not arise under a law renouncing a defense, though the result of the renunciation is an extension of the area of legislative power which will cause the suitor to prevail. * * * Here the right to be established is one created by the state. If that is so, it is unimportant that federal consent is the source of state authority. To reach the underlying law we do not travel back so far. By unimpeachable authority, a suit brought upon a state statute does not arise under an act of Congress or the Constitution of the United States because prohibited thereby. *Louisville & Nashville R. Co. v. Mottley, supra*. With no greater reason can it be said to arise thereunder because permitted thereby." *Id.* at 116, 57 S.Ct. at 99.

■■ The argument of the plaintiffs in this action is analogous to that which the Supreme Court rejected in the *Gully* case. The principle established is that a federal question is not presented merely because

the plaintiff's action is permitted or limited by a federal statute. The tax claim in *Gully* arose out of state tax law. Similarly, the plaintiffs' contract claim here does not arise under the federal statute even though it is asserted by the defendants to bar the enforcement of those contracts; it arises out of the law of the state. No federal question jurisdiction arises from the provisions of 25 U.S.C. § 81.

### THE ALASKA NATIVE CLAIMS SETTLEMENT ACT

Plaintiffs ask the Court to declare that the Alaska Native Fund is subject to liability for the balance of the payment allegedly due to plaintiffs under their attorney-client contracts with the defendants. As has been mentioned above, plaintiffs concede that they filed claims with the Chief Commissioner of the Court of Claims for compensation from the Fund, and that they have received an award out of the Fund. They want more. The Act, however, positively precludes the recovery of any additional amounts under a contract for attorney's fees when a claimant has received, or might have received, compensation from the Fund. Section 1619(f) provides:

"(f)(1) No remuneration on account of any services or expenses for which a claim is made or could be made pursuant to this section shall be received by any person for such services and expenses in addition to the amount paid in accordance with this section, and any contract or agreement to the contrary shall be void.

"(2) Any person who receives, and any corporation or association official who pays, on account of such services and expenses, any remuneration in addition to the amount allowed in accordance with this section shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than twelve months, or both."

These provisions bar an attorney from obtaining compensation under a contract for any services for which a claim was filed, or could have been filed, under the Alaska Native Claims Settlement Act. The plain provisions are that any contract or agreement to the contrary shall be void. At the hearing the Court inquired whether plaintiffs challenged the validity or constitutionality of this or any portion of the Act. Plaintiffs took the position, as they had done in their memorandum in opposition to motions to dismiss (part B, pages 12–15) that they are " * * * in no way [raising] constitutional issues relative to the Alaska Native Claims Settlement Act, the latter being irrelevant." Plaintiffs explained that their complaint "particularly avoided even mentioning" the statutory provisions which limit the amount of the recovery fund, which invalidate percentage contracts, and which establish time limits for challenging the Act itself. Plaintiffs thus do not contend that the provisions of the Act are not enforceable according to their terms insofar as they are applicable.

Indeed, with respect to Section 20 of the Act (43 U.S.C. § 1619(f)(2)), above, which makes it a criminal offense for a claimant to receive, or for a contracting party to pay, any remuneration in addition to that allowed pursuant to the Act, plaintiffs assert that in the context of their pleadings, their claim was neither one which had been "made" or which "could be made" *under* the Act. This argument appears to be based upon certain preliminary rulings made by the Chief Commissioner prior to passing upon the claim submitted to that court. Plaintiffs' position is that some part of their services were not compensable as attorneys' fees "rendered * * * in connection with" the Act's passage and therefore compensation for such services lies entirely outside the Act and payment is not barred by the Act. The reasoning is entirely circular. Since the constitutionality is not challenged, the Court is bound to give to the Congressional enactment the full meaning required by its common sense language, meaning the inclusion of all legal services involved, as are these, with the passage of the Act. Moreover, if plaintiffs' claims *never* were claims under the Act, the Chief Commissioner would have been without jurisdiction to take any action concerning them, or to have made the payments which plaintiffs

sought and got; nor would the Fund be obligated for paying such claims. But Section 20 (43 U.S.C. § 1619(b)) includes all claims for attorney and consultant fees and out-of-pocket expenses for services rendered before December ·18, 1971 to any native tribe, band, group, village, or association in connection with:

"(1) the preparation of this chapter and previously proposed federal legislation to settle Native claims based on aboriginal title, and

"(2) the actual prosecution pursuant to an authorized contract or a cause of action based upon a claim pending before any federal or state court or the Indians' Claim Commission that is dismissed pursuant to this chapter."

Plaintiffs' claims in all respects are of the kind which Congress intended by the Act to regulate. The Court concludes that Section 20 bars additional compensation alleged to be due for plaintiffs' services under their contracts. Furthermore, even if plaintiffs' claims are viewed as different in nature from attorneys' fees which are made payable out of the Fund, rather than constituting claims for "additional" compensation under the contracts with the native groups, the Act none-the-less would prevent this Court from ordering them to be paid from the Fund. Section 1619(c) provides that:

"(c) A claim under this section must be filed with the clerk of the Court of Claims within one year from December 18, 1971, and shall be in such form and contain such information as the Chief Commissioner shall prescribe. *Claims not so filed shall be forever barred.*" (Emphasis supplied).

The section requires claims on the Alaska Native Fund to have been filed by December 18, 1972, and to have been brought before the Court of Claims. Plaintiffs' action was filed in this Court on December 19, 1977. The claim for attorneys' fees to be paid out of the Alaska Native Fund must therefore be dismissed because it was not timely filed and the claim has not been filed in the proper forum.

## JURISDICTION BASED ON THE ADMINISTRATIVE PROCEDURE ACT

Plaintiffs invoke the Administrative Procedure Act (5 U.S.C. §§ 702 and 703) as a basis for jurisdiction to review the action of the Secretary of the Interior in disapproving the plaintiffs' contracts with the villages of Tetlin, Eagle and Northway. Plaintiffs do not allege that they took any steps to exhaust their administrative remedies. Rather, it is their position that the Administrative Procedure Act independently affords an implied grant of subject matter jurisdiction permitting direct federal judicial review of agency action. The Supreme Court of the United States has preempted this argument in its decision in *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The question there was whether Section 10 of the Administrative Procedure Act (5 U.S.C. §§ 701, 702) does constitute an independent grant to the district courts.of subject matter jurisdiction to review (in that case) a decision of the Secretary of Health, Education and Welfare where the Secretary declined to reopen a previously adjudicated claim for Social Security benefits. The court held unequivocally that the Act does not contain such a grant. Similarly, that Act cannot be used as a basis of jurisdiction here to review the actions by the Secretary of the Interior pursuant to 25 U.S.C. § 81 in disapproving of the above contracts.

## MANDAMUS JURISDICTION

Plaintiffs ask for a writ of mandamus asking the Secretary to determine an "equitable" fee due to plaintiffs for their services under their contracts with the Alaska native villages and regional associations. Mandamus, however, is proper only to command an official to perform an act which is a positive command and so plainly prescribed as to be free from doubt. The claim must be clear and certain, and the duty of the officer must be ministerial. *Smith v. Grimm,* 534 F.2d 1346, 1352 (9th Cir. 1976); *Jarrett v. Resor,* 426 F.2d 213 (9th Cir. 1970); *U. S. v. Walker,* 409 F.2d 477, 481 (9th Cir. 1969). The duty which

the plaintiffs seek to compel the Secretary to perform does not fall within the above standard, since the plaintiffs' entitlement to attorneys' fees is uncertain as to amount, and the Secretary clearly has large discretion. Mandamus therefore does not lie to compel the Secretary of the Interior to make the payments to the plaintiffs.

## THE CONSTITUTIONAL CHALLENGE TO 25 U.S.C. § 81

Plaintiffs vigorously seek to challenge the constitutionality of 25 U.S.C. § 81 on two grounds. First, they contend that the Secretary's power of prior approval of contracts with Indian tribes represents a chill to the exercise of First Amendment liberties in that it impinges upon the Alaskan natives' right to representation by counsel. They also allege that the Secretary's disapproval of three of their contracts was arbitrary and capricious and in violation of their due process rights as secured by the Fifth Amendment.

Defendants have moved to dismiss the claim founded on the First Amendment for failure to state a claim upon which relief can be granted, on the ground that the plaintiffs are attempting to vindicate First Amendment rights which belong to their clients and that plaintiffs lack standing to do so.

■ Circumstances do exist under which a litigant may be permitted to assert the constitutional rights of a third person even though that third person is not a party to the litigation. The approach to the question of standing to assert the rights of third-party non-litigants is almost always marked by caution and concern. Ordinarily, for considerations of both jurisdiction and policy, third parties are expected to act to protect their own rights. Courts are wary of volunteers whose interests are not at stake. There is need for assurance that the litigant's personal involvement in the issue will tend toward more effective advocacy and the presentation of genuine issues. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Federal courts also exercise care to make certain that jurisdiction is properly and appropriately invoked. See *Warth v. Seldin,* 422 U.S. 490, 498–501, 508, 95 S.Ct. 2197, 2205– 2206, 2210, 45 L.Ed.2d 343 (1975); *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

Judges often reach conflicting results as to standing when they seek to reconcile the various rules which the Supreme Court has made to avoid "passing upon a large part of the constitutional questions pressed upon it for decision," as has been stated by Mr. Justice Brandeis, concurring in *Ashwander v. Tennessee Valley Authority, et al.,* 297 U.S. 288, at 346, 56 S.Ct. 466, at 482, 80 L.Ed. 688 (1935).[1] See also *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 93 S.Ct. 346, 34 L.Ed.2d 415 (1972); *Shannon v. U. S. Dept. of Housing & Urban Dev.,* 436 F.2d 809 (3rd Cir. 1971); *Waters v. Heublein, Inc.,* 547 F.2d 466 (9th Cir. 1976); *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct.

[1]. In his concurrence in *Ashwander, supra,* Justice Brandeis set forth seven principles which from time-to-time determine the course of decision:

"1. The Court will not pass upon the constitutionality of legislation in a friendly, nonadversary proceeding, * * *.

"2. The Court will not 'anticipate a question of constitutional law in advance of the necessity of deciding it.' * * * *.

"3. The Court will not 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' * * *.

"4. The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. * * *.

"5. The Court will not pass upon the validity of a statute upon the complaint of one who fails to show that he is injured by its operation. * * *.

"6. The Court will not pass upon the constitutionality of a statute at the instance of one who has availed himself of its benefits. * *.

"7. 'When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" * * *. *Id.* 297 U.S. at 346–348, 56 S.Ct. at 482–83.

1031, 97 L.Ed. 1586 (1953); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

In *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), a divided Supreme Court again dealt with the criteria for determining when a plaintiff may have standing to raise violations of another's First Amendment rights. There, two Missouri physicians challenged a statute which excluded non-therapeutic abortions from Missouri's Medicaid benefits program. The relief sought was a declaratory judgment of the statute's invalidity and an injunction against its enforcement. Among the grounds stated were that the statute interfered with the doctor-plaintiffs' right to practice medicine; deprived their patients of the rights of women to determine whether to bear children and the right to receive safe medical advice and care; and deprived both plaintiffs and patients of the equal protection of the laws. Without filing answer, the defendants moved to dismiss claiming that there was no case or controversy and that plaintiffs lacked "standing to litigate the constitutional issues raised"; * * * and that plaintiffs "cannot litigate the alleged deprivation or infringement of the civil rights of their welfare patients." 428 U.S. at 110, 96 S.Ct. at 2872. A three-judge district court dismissed that part of the complaint for lack of standing. The Court of Appeals for the Eighth Circuit reversed, finding that respondents themselves had standing and that they also had alleged an interest which was arguably within the protective zone of the First Amendment. That court then found on the merits that the statute violated the equal protection clause. *Wulff et al. v. Singleton, etc.,* 508 F.2d 1211 (8th Cir. 1975).

The Supreme Court reversed. All nine justices agreed that the doctors had standing to bring the suit and to assert their own constitutional rights, if any, in attacking the statute. They also agreed that the court of appeals had erred in proceeding to consider the merits of the case and Justice Blackmun (with whom concurred Justices Brennan, White and Marshall, and Justice Stevens, concurring in part, thus making a five-justice majority) agreed that the physicians had a financial stake in the litigation and standing to bring an action challenging a statute which they claimed impaired their own constitutional rights. Justice Blackmun articulated the standing questions as follows:

"Although we are not certain that they have been clearly separated in the District Court's and Court of Appeals' opinions, two distinct standing questions are presented. We have distinguished them in prior cases, e. g., *Data Processing Service v. Camp,* 397 U.S. 150 at 152–153, 90 S.Ct. 827 at 829, 25 L.Ed.2d 184; *Flast v. Cohen,* 392 U.S. 83, 99, n. 20, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968); *Barrows v. Jackson,* 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953), and they are these: First, whether the plaintiff-respondents allege 'injury in fact,' that is, a sufficiently concrete interest in the outcome of their suit to make it a case or controversy subject to a federal court's Art. III jurisdiction, and, second, whether, as a prudential matter, the plaintiff-respondents are proper proponents of the particular legal rights on which they base their suit." 428 U.S. at 112, 96 S.Ct. at 2873.

He then outlined the factors which indicated that concrete injury had been suffered by the doctors and that there was an adverse interest between them and the defendants, so that a case or controversy in the constitutional sense clearly existed. He then proceeded to review the rules which determined whether a party could assert the rights ("*jus tertii*") of third persons. He pointed out that where the right of the third party is inextricably bound up with the activity which the litigant wishes to pursue, the court has assurance that in considering the claimed right it is not doing an unnecessary thing and, further, that the litigant is probably about as effective a proponent of the right as would be the third parties themselves. Another factual element pointed out by Justice Blackmun was the ability of the third party to assert his own right, an outstanding example of

which was involved in *NAACP v. Alabama, supra,* where the court had held that the NAACP could invoke the First and Fourteenth Amendment rights to resist a court order to divulge the names of its members. The court there reasoned that to require the members themselves to claim their right would "result in nullification of the right at the very moment of its assertion." 357 U.S. at 459, 78 S.Ct. at 1170.

Justice Blackmun found a parallel between the case at bar and the protective reasoning of the *Alabama* case, as well as that involved in *Griswold v. Connecticut, supra.* As to the woman's assertion of her own rights in abortion cases, he raised the possibility that she might be "chilled" by a desire to protect her privacy; furthermore, there would be but limited time between the formation of a pregnant woman's decision to seek abortion, and the time within which it could be medically accomplished without becoming too late. For these reasons, he concluded that it was generally "appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision, * * *."

Mr. Justice Powell, with whom the Chief Justice and Justices Stewart and Rehnquist joined, dissented. The dissent pointed out that the close and confidential relationship described by the plurality did not logically pave the way for permitting the physicians to assert their patients' rights: the state was not forbidding the patients to have abortions, nor the physicians to perform them; the impact of the statute was that Missouri did not make its Medicaid payments available for such operations. The dissenters believed that while this would cause the doctors financial detriment and afford them Article III standing, it did not "justify abandonment of the salutary rule against assertion of third party rights." 428 U.S. at 129, 96 S.Ct. at 2881.

The foregoing discussion emphasizes the problems created in attempting either to apply or depart from the rule that one may not in general assert the constitutional rights of a third party.

The difficulties are not so insuperable in the case at bar, for plaintiffs have not shown that they have suffered "injury in fact" or that, as a prudential matter, they are proper proponents to assert the constitutional rights of their clients, even though both sides were permitted to augment the record by submission of factual material.

Turning first to the injury-in-fact requirement, this principle has received further discussion more recently in *Duke Power Co. v. California Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). That case dealt with the constitutionality of the Price-Anderson Act by which Congress had imposed a $560,-000,000 limitation on liability for nuclear accidents. Plaintiffs were a labor union and a number of individuals who resided near the plants in question, and who sought a declaration of unconstitutionality of the limitation. The trial court had proceeded to consider the issue of constitutionality and having found that the plaintiffs had standing to make the challenge because they were exposed to the potential harm of accident, then held that the limit of recovery imposed by Congress was not rationally related to the potential losses which plaintiffs might contingently suffer.

The Supreme Court reiterated the guiding principles:

"The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). As refined by subsequent reformulation, this requirement of a 'personal stake' has come to be understood to require not only a 'distinct and palpable injury,' to the plaintiff, *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), but also a 'fairly traceable' causal connection between the claimed injury and the

challenged conduct. *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). See also *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976); *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). Application of these constitutional standards to the factual findings of the District Court persuades us that the Art. III requisites for standing are satisfied by appellees." 438 U.S. at 72, 98 S.Ct. at 2630 (1978).

The majority opinion articulated by the Chief Justice found, by a process not easy to follow, that there was sufficient standing for the parties to have the question tendered for decision. The obvious question as to whether the claims involved something more than a speculative future and uncertain injury at all,—whether in the familiar sense, there was a "ripe" issue—was disposed of by the majority through a prudential reasoning approach which may yet create future problems. The opinion noted that delayed resolution would frustrate one of the key purposes of the Price-Anderson Act which was the elimination of doubts concerning the scope of private liability in the event of major nuclear accident. The question was thus deemed presently ripe for adjudication on the merits. On the merits, the legislation was held to be a fair and reasonable substitute for the uncertain recovery which might otherwise occur from the probability of exhaustion of the offending utility's resources.

Justice Stewart concurred in the decision but for different reasons. Justice Stewart felt that if there was federal question jurisdiction at all, it lay only in the allegation that enforcement would deprive appellants of a property right. The Act did impinge upon such a right but he said, "there never has been such an accident, and it is sheer speculation that one will ever occur." 438 U.S. at 95, 98 S.Ct. at 2642. For that reason he found there to be no present justiciable controversy.

Justices Rehnquist and Stevens went squarely to the issue which is involved in the instant case. They held that plaintiffs' first asserted basis for relief did not state a claim "arising under" the Price-Anderson Act. The complaint was that operation of the nuclear plants would cause immediate injury, and under North Carolina law a right of action accrued as soon as such wrongful act, however slight, had been committed. The concurring Justices pointed out that this was a state created, not a federally created, right. Thus, they said, the constitutionality of the Act would become relevant only should Duke Power invoke the Act as a defense to a suit for recovery under the North Carolina right of action. This would bring the case back full circle to the rule of *Louisville & Nashville RR Co. v. Mottley, supra*, that anticipation of a possible federal defense to a state action is not sufficient to invoke federal question jurisdiction.

■ In this case, no right of association either of the plaintiffs or of their clients is impeded or frustrated by the provisions of 25 U.S.C. § 81. In seeking to raise a First Amendment claim on behalf of the Alaskan natives, plaintiffs would as a threshold problem be compelled to demonstrate a "fairly traceable causal connection" between the claimed injury and the statute. They do not, and cannot, make this showing. In fact, no association rights of the clients are at all involved. Plaintiffs were aggrieved, if at all, by the fact that they did not receive full compensation to the extent of their claims for attorneys' fees. To the extent that their clients are involved, plaintiffs' failure is the clients' success for their interests in the Fund go undiminished. But there exists no causal connection between the attorneys' lack of success and the action taken by the Secretary pursuant to 25 U.S.C. § 81. It was the Alaska Native Claims Settlement Act which circumscribed their right to recover further compensation under the terms of their contract with the Alaskan natives. That Act channeled their right of recovery and limited it to the procedures established for distributions from the native Fund. The amount allocated by Congress to the Fund was insufficient to cover in full all of the claims tendered against it. When it became

apparent that the aggregate amount of the claims exceeded the Fund, plaintiffs and other claimants stipulated for a pro rata distribution among themselves of the amounts that were in the Fund. Plaintiffs are dissatisfied with this reduction of their award out of the settlement and complain that they have been inadequately compensated for work performed. This would give plaintiffs standing under other circumstances to challenge the Act. But the injury does not arise from 25 U.S.C. § 81 but only from the terms of the Alaska Native Claims Settlement Act. Whether or not 25 U.S.C. § 81 might under other circumstances violate the First Amendment is not at issue at this time, since plaintiffs could not proceed under their attorney-client contracts even if the latter statute did not exist, and plaintiffs do not here challenge the interdiction of the Alaska Native Claims Settlement Act. They therefore have no standing to raise First Amendment claims on behalf of their clients since they do not demonstrate any injury to themselves or the clients resulting from the application of the statute.

For the same reasons plaintiffs' claims that the Secretary's disapproval of three of their contracts amounted to arbitrary and capricious action in violation of their due process rights, must also be dismissed. Plaintiffs conceded during oral argument on this motion that the Secretary's approval of the attorney-client contracts under 25 U.S.C. § 81 was not a condition precedent to their filing claims for attorneys' fees under the Alaska Native Claims Settlement Act. The latter statute completely superseded the operation of Section 81 with respect to these particular contracts. Furthermore, it rendered the contracts entirely inoperative whether or not they had been previously approved by the Secretary. Thus, the Secretary's disapproval of the contracts was irrelevant and could not have injured the plaintiffs. Their contention that his disapproval was arbitrary and capricious fails to state a justiciable controversy within the meaning of Article III of the Constitution. The Court concludes that this cause of action should be dismissed for failure to state a case or controversy between the parties.

## CONCLUSION

In summary, the Court holds that the motion to dismiss the complaint should be granted on the several grounds referred to above. The district court has no jurisdiction to enforce the attorney-client contracts out of the Alaska Native Fund because no federal question is presented by their claim. Enforcement of those contracts is barred by Section 1619(f) of the Act, which makes such agreements void. Plaintiffs' efforts to obtain through this Court additional compensation directly under the Act itself fails because they have not complied with the provisions of that statute which prescribed the time within which such claims must have been filed, and which limits jurisdiction over them to the Court of Claims. For reasons that have already been discussed, the Administrative Procedure Act does not constitute an independent grant of subject matter jurisdiction to the district courts for review of agency actions and, if it did, plaintiffs would still have no justiciable controversy to bring to the district court. Mandamus jurisdiction does not lie to compel the Secretary of the Interior to establish and pay an "equitable" fee to the plaintiffs for services claimed to have been performed under their contracts.

Finally, the plaintiffs' constitutional challenges to 25 U.S.C. § 81 and to the Secretary's actions pursuant thereto must be dismissed for failure to state a justiciable controversy.

Accordingly, IT IS ORDERED that the complaint herein be, and the same hereby is, DISMISSED.