Juan M. HUERTA
v.
The UNITED STATES.
No. 110–69.

United States Court of Claims.

Jan. 26, 1977.

As Amended on Denial of Rehearing
and Rehearing En Banc
March 4, 1977.

F. Trowbridge vom Baur, Washington, D. C., atty. of record, for plaintiff; vom Baur, Coburn, Simmons & Turtle, Washington, D. C., of counsel.

Marc J. Fink, Washington, D. C., with whom was Asst. Atty. Gen., Rex E. Lee, Washington, D. C., for defendant.

Before COWEN, Chief Judge, and DAVIS and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's exceptions to the recommended decision of Trial Judge Louis Spector, filed October 21, 1975, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision,* as hereinafter set forth, it hereby affirms and adopts said decision as the basis for its judgment in this case. It is, therefore, concluded that plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF TRIAL JUDGE

SPECTOR, Trial Judge:

When Fidel Castro came to power in Cuba in 1959, many Cuban nationals and others lost commercial and personal property located in Cuba as a result of the confiscatory acts of the Castro regime. Plaintiff in this case, Juan M. Huerta, a Cuban national until his American naturalization in 1974, was one of those who incurred property losses attributable to the policies of the Cuban Government. His position is unique, however, in that part of his property so lost was situated on territory controlled not by Fidel Castro but by the U. S. Navy at Guantanamo. He brings this action to recover almost $900,000 on the alternative grounds of breach of contract, and the un-

---

* The opinion of Davis, Judge, dissenting in part, follows the opinion of the trial judge which has been adopted by the court.

Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed October 21, 1975, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

compensated taking of property. The property, hereinafter described, has rested on the naval base since the early 1960's, and what is left of it remains there today.

Plaintiff, aided by his brother Guillermo Huerta, conducted a large and profitable demolition, salvage, and construction materials business in Santiago, Cuba, during the period 1956–63. Beginning in 1958, he from time to time performed demolition work for the Navy on its base at Guantanamo Bay, some 80 miles from Santiago. In the years 1960, 1961, and 1962, plaintiff was awarded and performed five demolition contracts on the base, taking as the principal consideration for his work the title to all materials, with certain exceptions not relevant here, which he carefully salvaged from the structures he demolished. It had been plaintiff's custom under previous contracts to remove the salvaged materials to his place of business in Santiago for eventual resale. There was a brisk market for those materials in Cuba. However, for reasons vigorously disputed by the parties, the materials salvaged from the above five contracts never left the base but remained on a storage site that the Navy made available for plaintiff in late 1960. Those materials, now valueless due to prolonged exposure to the elements and certain alleged thefts, are the subject matter of this case.

Plaintiff claims that the United States is responsible for the fact that he received no economic benefit from his salvaged materials because of the acts and omissions of certain Naval personnel on the base. He states three separate grounds for recovery. First he says the United States breached all five contracts when Navy officials in effect refused his requests for permission to take the materials into Cuba. They did this, he avers, by continually telling him over a 2-year period that removal to Cuba was not currently permissible, all the while assuring him that obstacles to removal would soon disappear. However, he says permission to remove was never granted, and this converted the Navy's words into ones of refusal.

Plaintiff's first theory of recovery is that the Navy's refusals constituted a breach by depriving him of the principal consideration for his contracts, by violating an implied covenant of cooperation, or by amounting to a cardinal change order. The latter premise is based on the parties' understanding in executing the contracts that plaintiff could and would take the salvaged materials into Cuba for resale.

The second ground asserted is that there was a taking of his property without compensation, by virtue of the same Navy refusals of his requests to remove it (hereinafter, "first taking claim"). Finally, plaintiff complains that his materials, while stored on the base, were physically appropriated by agents of the United States and used in the building of base structures. This, he urges, also constituted an uncompensated taking of his property ("second or pilferage taking claim").

The Government disclaims all responsibility for plaintiff's loss. It responds that plaintiff never requested permission to take his materials into Cuba; that he elected not to take the property there, for reasons hereinafter amplified, and that there was no appropriation of the materials for a public use by agents of the United States.

The defendant further disavows liability by raising a series of independent defenses unrelated to the above-described issue on the merits. Its answer to the petition alleges that since plaintiff was a Cuban national, this court lacks jurisdiction to entertain his suit under the so-called Reciprocity Statute, 28 U.S.C. § 2502 (1970), unless American citizens also had the right to sue the Cuban Government in its courts. Next, says defendant, the defense of "sovereign act" relieves it of any liability in contract that may arise from the imposition of a trade embargo in 1962, as further described below. Finally, it raises for the first time (in its response to plaintiff's pretrial statement on liability) the defenses that the 6-year Statute of Limitations, 28 U.S.C. § 2501 (1970), had run before plaintiff filed his petition in this court on February 26, 1969,

and further that the Government was discharged by releases executed by plaintiff on each of the five contracts. None of these independent defenses was raised by filing a motion for summary judgment.

As hereinafter indicated, this case has from the beginning been considered and tried on its facts, and on the "merits" issue earlier described. Resolution of that issue therefore represents the most efficient avenue for disposition of the case.

Trial was held on the breach and the two taking theories from March 26 to April 1, 1974. Earlier, the contracting officer had issued a final decision on August 9, 1967, denying plaintiff's request for an equitable adjustment under the five contracts. Plaintiff thereafter prosecuted an appeal to the Armed Services Board of Contract Appeals. The board denied the appeal on April 6, 1971, on the ground that relief was not available to plaintiff under the contract terms. On July 6, 1971, plaintiff filed a petition with this court amending his originally filed protective petition of February 26, 1969. The amended petition is the basis for the present suit for a breach and a taking. Plaintiff then moved for a trial de novo in this court. His motion was granted and not appealed. Defendant's later motion that the board's decision be deemed binding in the trial de novo was denied, and the denial upheld on appeal.

The testimony on the merits of the case is voluminous and in direct conflict, although certain details providing background for the parties' various actions are not disputed, and provide an important objective guide to resolution of conflicting evidence. The evidence is set forth in detail in the findings of fact, and only briefly summarized here.

The Government of Cuba, under Castro's leadership, embarked on a program of state ownership and direction of major, basic business enterprises in Cuba beginning in 1960. A large number of Cuban-owned businesses were "nationalized" or "intervened" immediately and this pattern was continued over a period of years until even small enterprises were subjected to seizure starting in 1964. During the same period

relations between the United States and Cuba deteriorated rapidly. All American property in Cuba was expropriated in late 1960, following President Eisenhower's reduction of the Cuban sugar import quota. After expropriation, the Commerce Department issued a ban on exports from the United States to Cuba.

The first contract at issue was signed just before the expropriation of American property by Cuba, and the second contract shortly thereafter. The two nations severed diplomatic relations in January 1961, just as performance on the first two contracts neared completion. By April of 1961, the Bay of Pigs invasion had occurred, failing in its objective, and creating further hostility between the two countries. Soon thereafter the Cuban Government forbade the movement of all vehicular traffic through the northeast gate at Guantanamo. This was the only land route from the Guantanamo Base to Cuba. In May 1961, the Cuban Central Bank placed tighter controls on foreign exchange transactions involving American dollars and Cuban pesos.

After performance under the third contract was completed, and while work on the fourth was underway, President Kennedy, on February 3, 1962, issued Proclamation No. 3447, placing a total embargo on Cuban-American trade. This Proclamation recited that the earlier Commerce Department ban on exports to Cuba remained in effect. Plaintiff and base construction officials thereafter recognized the February 1962 Proclamation as a legal impediment to the movement of plaintiff's property into Cuba from Guantanamo, and as the first such explicit barrier. The following month plaintiff signed the fifth and last contract. This was the only one containing a clause expressly permitting plaintiff to store his materials on the base.

On the breach of contract and "first taking" claim issues, the parties disagree as to whether plaintiff actually ever requested permission to take his materials from the base and into Cuba. This is the fundamental issue. There is a substantial body of evidence and a host of arguments addressed

to that crucial issue of fact. Plaintiff and his brother, Guillermo, testified that they made such requests to officials of the Base Public Works Center to whom such removal requests were traditionally addressed. The latter deny ever receiving any such requests. Each side produced exhibits and additional testimony in support of its respective version of the facts.

Defendant's witnesses state, for example, the plaintiff did not make timely cash payment of sums owed to the defendant under the first two contracts, due to his shortage of American dollars. Since this was the only form of payment acceptable under the contracts, the Navy then reluctantly arranged for the purchase of part of plaintiff's salvaged materials to satisfy plaintiff's debts to defendant. The significance of this, argues defendant, is that plaintiff could not have made his first three removal requests, as he testified he did, until those contract debts were satisfied since the contracts, by their terms, forbade removal of salvaged materials from the base until payment by the contractor. Plaintiff responds that he did not experience a dollar shortage at all during this period, and that the purchase of part of his salvaged materials to satisfy his contract obligations was the Navy's idea, not his. The Navy wanted the materials, he avers, or wished another party to have them.

Plaintiff accuses the Navy of blocking removal of his materials for the purpose of denying aid to the Castro Government, a goal popularly supported by public opinion at Guantanamo, particularly among the refugee population. Public Works officials respond that they had no such motivation and knew of no base policy to this effect. On the contrary, they testify, plaintiff was worried that if he took his materials into Cuba the Cuban Government would confiscate them, and he had so advised the Navy. Plaintiff denies that he had any fears of this sort nor that he made statements to that effect. Plaintiff further asserts that others on the base had heard him complain about Navy refusals to grant his removal requests and that one Sgt. (now Capt.)

George Alvarez, USMC, told plaintiff that base officials could not let his salvaged materials enter Cuba due to the embarrassment that would result from aiding the Castro Government. Plaintiff's contacts with Alvarez, who was assigned to intelligence duty by the base commander, were to convey information to him about events in Cuba. The Huerta brothers made frequent trips back and forth in connection with their business.

Defendant replies that the testimony of plaintiff's witnesses to that effect, including that of Alvarez, is mere hearsay, and that in any event it is not probative of the conduct of Public Works officials in charge of these particular contracts. It is further argued that Alvarez' statement represented a personal opinion, as he admitted, and that it was merely an affirmation of the fact that the 1962 trade embargo had by then already been imposed, rendering all other discussion academic.

To plaintiff's claim that the northeast gate into Cuba was closed by the Navy in February 1961, defendant responds that one Vargas, another demolition contractor, had taken his salvaged materials into Cuba through that gate in late February or early March 1961. Plaintiff also suggests that he was losing faith in the Navy's assurances of eventual permission to remove salvaged material, and this explains why he required greater compensation for the fifth and last contract. Defendant counters that he was the sole bidder for the fifth contract, and that would explain the higher compensation paid.

There is in the record a Public Works' letter of March 1, 1963, acknowledging a removal request had been made by plaintiff. Defendant explains that plaintiff asked the Public Works Center to write such a letter as a ploy to keep certain Cuban officials at bay. They were pressuring plaintiff to bring his salvaged materials into Cuba, a step which plaintiff did not wish to take. Defendant further questions why plaintiff never reduced his alleged removal requests to writing, and plaintiff ex-

plains that such requests had traditionally been oral.

The foregoing very lightly summarizes the conflicts in the testimony at trial. One thing is clear. Plaintiff's failure to take his salvaged materials into Cuba was followed by seizure of his entire Santiago business property by the Cuban government. He was reimbursed for only a fraction of its true value. Plaintiff and his brother thereafter became exiles.

Prior to exile, in August 1962, plaintiff had sought permission from the base to travel abroad to market his salvaged materials elsewhere, but he was refused permission on the ground that the 1903 Base Leasehold Agreement between Cuba and the United States prohibited use of the base as a commercial port by Cuban nationals. After he was exiled, however, he requested and received permission in mid-1963 to leave the base for the United States, and he attempted in at least one instance to locate buyers there for his salvaged materials. Public Works Center officials aided in this venture. Plaintiff returned to the base only once (from October 1963 to January 1964), and he has since lived in the United States. He has never managed either to sell or to remove the materials stored in Guantanamo.

■ Upon a review of the evidence as a whole, as detailed in the findings, it is concluded that plaintiff has failed to establish he ever made a request to the Public Works Center, or to anyone else in authority, for permission to remove his salvaged materials to Cuba. Instead, the evidence compels the conclusion that plaintiff elected to retain the materials at the storage site on Guantanamo, rather than ship his property into Castro Cuba, because that was the lesser of two evils during the period in question.

On the "second or pilferage taking claim," the parties are in equally serious dispute as to whether any persons removed plaintiff's materials from his stockpile without his approval, let alone whether any such persons who may have so removed materials did so as defendant's agents, or with authority from defendant. The use to which the allegedly pilfered materials was put, is also in dispute. Plaintiff contends through his witnesses that military and other base personnel from time to time took quantities of materials from his stockpiles and used them in Government construction on the base. However, no witness for plaintiff could testify to an occasion when he saw base construction personnel actually remove material from the stockpile without plaintiff's permission.

Furthermore, the quantum of materials said to have been taken was not stated; the authority of the alleged pilferers was not established; and the base structures which allegedly benefited from the pilferage were not identified. Defendant did establish through the testimony of Public Works officials, moreover, that orders had been issued to all base personnel, civilian and military, involved in Government construction work at Guantanamo, to the effect that plaintiff's materials were private property and could be acquired only with plaintiff's authorization.

Taking all the evidence on this issue into account, it is further concluded that plaintiff has not established the removal or pilferage of his property by persons on the base, nor the identity of the alleged pilferers as agents of the defendant, nor the use of his property in Government structures, nor the authority for any such appropriation or use.

On the basis of the foregoing ultimate conclusions of fact, it follows that plaintiff is not entitled to recover on any of his three stated grounds. A breach would depend on requests for permission to remove, which were wrongfully refused. Those essential facts have not been established in this case.[1]

The second ground predicated on an uncompensated "taking" is also starved for want of the same essential facts, namely, persuasive proof of requests for permission

---

1. *See* and contrast *Miller v. United States,* 140 F.Supp. 789, 135 Ct.Cl. 1 (1956), where a purchaser of Government property was specifically advised by the Government that it would not be delivered to him.

to remove, followed by refusal of those requests. One can readily appreciate the plight of plaintiff, unable to remove his property to any place but Cuba because of the 1903 lease agreement for Guantanamo, and unwilling to remove it to Cuba because of the historical events which had overtaken that country. As a result, his property was virtually imprisoned on the base. But that is not to say that defendant, in its contractual capacity, was responsible for these most unfortunate circumstances.[2]

The concept of a "taking" of property, within the contemplation of the fifth amendment, is premised on "governmental actions entail[ing] * * * an actual invasion of private property rights." Though there need be no official intention to acquire any property interest "interference with use or possession" of property is essential to a taking claim. *Eyherabide v. United States,* 345 F.2d 565, 567, 170 Ct.Cl. 598, 601 (1965). Plaintiff has simply failed to establish that Navy officials acted to invade his rights in the salvaged materials, or to interfere with his use or possession thereof, by denying transit to Cuba, or otherwise.[3]

The "second or pilferage taking" claim relies on different facts. Plaintiff's witnesses referred to these alleged appropriations as thefts, stealing, and pilferage. But here again the evidence falls short. It has not been shown that materials were removed by persons acting without plaintiff's permission, that those persons were Government agents, or that the material so removed was incorporated in Government construction.[4]

■ If unlawful acts by Government personnel did in fact occur, they would not in any event constitute a "taking" by defendant, but rather tortious acts beyond the jurisdiction of this court to consider.[5]

Accordingly, it is concluded that plaintiff is not entitled to recover on any of the three grounds offered. In view of that conclusion on the facts, and on the merits, it is unnecessary to reach the independent issues raised by defendant as earlier mentioned, nor the contentions of the parties addressed thereto, on sovereign act, jurisdiction, releases and limitations.

DAVIS, Judge, dissenting in part:

I join the majority of the panel in adopting most of the Trial Judge's opinion and findings but I dissent with respect to the so-called "pilferage taking claim." As to that demand I think that claimant has shown enough to warrant a judgment in his favor on liability, as well as a remand to the Trial Division to determine the amount of that taking and the quantum of recovery.

The main facts and factors leading me to the other position on this claim are these: (a) it is undisputed that by 1973 almost all of the lumber and material had disappeared, and it seems to me clear that by 1967 very serious losses had occurred; (b) the record makes it very unlikely, in my view, that the bulk of these losses was due

2. Plaintiff cites the 1960 Commerce Department export ban, the 1962 trade embargo, and the alleged assurances of Navy officials that these obstacles would eventually be lifted, as Government action that deprived him of his property. But those public acts were general acts of the sovereign and do not establish liability for breach, or for a taking in the circumstances of this case. *See,* for example, *Glasgow Associates v. United States,* 495 F.2d 765, 770–71, 203 Ct.Cl. 532, 542–43 (1974).

3. *See & cf. Lemmons v. United States,* 496 F.2d 864, 204 Ct.Cl. 404 (1974); *Societe Cotonniere Du Tonkin v. United States,* 171 F.Supp. 951, 145 Ct.Cl. 426 (1959), *cert. denied,* 361 U.S. 965, 80 S.Ct. 594, 4 L.Ed.2d 545 (1960).

4. *See Eyherabide,* text at note 3 *supra. See also Porter v. United States,* 496 F.2d 583, 204 Ct.Cl. 355 (1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975); *Housing Corp. of America v. United States,* 468 F.2d 922, 925, 199 Ct.Cl. 705, 711 (1972); *Kelly v. United States,* 146 Ct.Cl. 416 (1959), *cert. denied,* 362 U.S. 975, 80 S.Ct. 1057, 4 L.Ed.2d 1010 (1960).

5. *United States v. North Am. Transp. & Trading Co.,* 253 U.S. 330, 334, 40 S.Ct. 518, 64 L.Ed. 935 (1920); *Schillinger v. United States,* 155 U.S. 163, 168, 15 S.Ct. 85, 39 L.Ed. 108 (1894); *Anggelis v. United States,* 202 Ct.Cl. 1094, *cert. denied,* 414 U.S. 1065, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973); *Algonac Mfg. Co. v. United States,* 428 F.2d 1241, 1249, 192 Ct.Cl. 649, 663 (1970); 28 U.S.C. § 1491 (1970).

to climatic conditions or to sales by the plaintiff; (c) on the contrary, the record persuades me that the great bulk of the materials were taken by personnel living or stationed on the base for use in connection with buildings or structures (on the base) owned by the United States and affixed to real property leased for a very long period to the United States (there were no private buildings and no private lands on the base); (d) there was sufficient, uncontradicted testimony that many of the materials removed from plaintiff's lots were taken by United States personnel in uniform and in government vehicles; (e) the Government necessarily received and retained the benefit of the removed materials because they were incorporated and used in government-owned buildings and structures; (f) whether or not the takings of this property were initially authorized, the Government obtained and retained the benefit of the removals and should therefore be required to pay just compensation (*see Oro Fino Consolidated Mines, Inc. v. United States,* 92 F.Supp. 1016, 1019, 118 Ct.Cl. 18, 23 (1950), *cert. denied,* 341 U.S. 948, 71 S.Ct. 1015, 95 L.Ed. 1371 (1951); *Forest of Dean Iron Ore Co. v. United States,* 65 F.Supp. 585, 106 Ct.Cl. 250 (1946); *Silberman v. United States,* 71 F.Supp. 895, 896 (D.Mass.1947); *Ivey v. United States,* 88 F.Supp. 6, 8–9 (E.D.Tenn. 1950) ); and (g) in any event, the defendant's inadequate efforts to prevent pilferage by personnel over whom it had the widest control (*i.e.* all personnel on the base), especially since that pilferage redounded to the defendant's own ultimate benefit, lead me to conclude that the "takers" had sufficient implied authority (*cf. Eyherabide v. United States,* 345 F.2d 565, 570, 170 Ct.Cl. 598, 606–607 (1965) ).

This taking claim is not barred by limitations since, in my view, it did not mature until after June–July 1963 (*see* finding 79 and *United States v. Dickinson,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947) ). The petition here was filed less than six years later in February 1969. As for the defense under 28 U.S.C. § 2502 (reciprocity), I would hold that provision inapplicable to

suits by alien friends for just compensation for property taken by the United States within an area over which the United States has as much control as over Guantanamo Navel Base. *See Russian Volunteer Fleet v. United States,* 282 U.S. 481, 491–92, 51 S.Ct. 229, 75 L.Ed. 473 (1931).

### CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.