**SOUTHERN CALIFORNIA FINANCIAL CORPORATION**

v.

**The UNITED STATES.**

**No. 79–74.**

United States Court of Claims.

Sept. 10, 1980.

Paul J. Hall, Los Angeles, Cal., for plaintiff; Marshall Manley, atty. of record. Manatt, Phelps, Rothenberg & Tunney, Los Angeles, Cal., of counsel.

C. David Redmon, with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant; Nancy E. Stanley, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and DAVIS and NICHOLS, Judges.

OPINION

DAVIS, Judge:

Plaintiff Southern California Financial Corporation sues for an inverse condemna-

tion of a tract of land adjoining that part of March Air Force Base, near Riverside, California, which is used as a bomb and ammunition storage area. The Government's motion for summary judgment was previously denied and the case was remanded for trial. The case has been tried before Trial Judge Schwartz, and we now hold, reversing the trial judge's opinion, that plaintiff is not entitled to prevail in this suit.[1]

From 1949 to 1961, the United States had possession of the tract as a tenant of plaintiff's predecessor, pursuant to nonexclusive leases for periods of a year or less, each lease extendible for four or five periods of a year. All the renewal options were exercised through 1961. In 1962, the owner declined to lease the land at the offered rental, and so the Government condemned a 6–month lease, extendible for periods of 1 year each. A similar condemnation took place in 1967.

Plaintiff bought the land in 1969. When the 1967 lease as extended expired in 1972, plaintiff would not agree to another lease, and asked that the Government buy the fee. The Government thereupon instituted another proceeding to condemn a lease of the same kind as before. A defense in the condemnation proceeding that the series of leases amounted to a condemnation of the fee, for which full payment ought to be made, was dismissed by the District Court, on the Government's motion contending that such a defense could not be raised in the court in which condemnation proceedings were instituted.

The condemnation proceeding continued in the District Court and culminated in a leasehold similar to those in the past, beginning in 1972. Plaintiff brought suit here in 1974 for an inverse condemnation of the fee, or more properly, of plaintiff's reversion. Another leasehold, similar to those in the past, was condemned in 1977, extendible until 1981.

The trial judge has found the following in this suit: "The bomb and ammunition storage area of the March Air Force Base is located in its northwest corner. The tract

in question, some 119.5 acres, abuts this corner on both the north and the west, and serves the base as a buffer or safety zone for the event of a possible explosion of the stored bombs and ammunition. It [appears most probable] that March Air Force Base, one of the oldest and largest of its kind, will remain indefinitely a major air force base and that so long as bombs and ammunition are used, and stored as they [now] are, the plaintiff's land will be needed as a buffer and safety zone. Further, it is agreed that there are no plans to change the place of bomb storage; the storage installation is a permanent one. * * * While the leases are non–exclusive, and reserve to plaintiff the right to conduct agricultural operations, the land cannot be farmed with profit. Residential development and substantially all other use is forbidden under the terms of the leases; structures for 'human habitation' may not be built or maintained, and gatherings of more than 25 persons are forbidden." Trial Judge's Opinion at 3–6.

The history of the Government's attitude toward the length and type of the condemnation of this land is revealing. It is undisputed that since at least 1953 defendant has had a need for the property for an indefinite term contingent upon the existence of an ammunition storage area in its present location on March Air Force Base. Beginning in 1956 the Air Force considered whether to acquire fee title to the tract in suit, but by 1963 the acquisition of a fee had been abandoned and it was decided to continue leasing the land on temporary renewable terms, because leasing was more economical for the United States–so the trial judge has found. This decision was reaffirmed in 1967 and not again questioned by the acquiring agency. The trial judge found, and we need not disagree: "The Government's motive is simply economy. The Air Force, recognizing that its need was permanent, has at times considered the relative cost of leasing and buying, concluded that leasing would be cheaper, and dropped the idea of acquisition of a

---

1. The necessary findings of fact are contained in this opinion.

fee. Moreover, it is administratively easier to pay the modest annual rent fixed in the condemnation proceedings than to obtain an appropriation of the money to pay for a fee or a permanent easement. Annual rents can be paid from a non-specific appropriation for maintenance. Condemnation of the fee or a permanent easement, on the other hand, would require the Air Force to seek an appropriation in competition with all other capital improvements for which Congress must be asked for money. The reluctance to seek a large enough appropriation to pay for the interest actually taken is seen in the present record." [2] *Id.* at 5.

At the trial, plaintiff made proof that the highest and best use of the land is to hold it for speculation for future development as a residential area. The speculative potential is somewhat dubious for a number of reasons, among them the noise of overflying planes, the proximity of the land to the ammunition dump and the restrictive zoning, under which residential development is not possible. But exact value aside, the trial judge found that the use to which the Government puts the land, coupled with the intention to condemn an indefinite series of leases, deprives the plaintiff of the highest and best use of the land. This, according to the trial judge, meant that defendant had taken an interest tantamount to a fee or perpetual easement for which just compensation had to be made. The amount was left for further litigation.

## I

We can assume *arguendo* (and without deciding) that the trial judge's determination of the hard facts is fully correct, but nevertheless we cannot hold that a compensable taking of a fee or perpetual easement has occurred. The reason why we depart from the trial judge is that, unlike him, we find lack of authority for the Air Force, acting by itself, to take a fee or perpetual easement of the value involved here. That authority could be given only in a Military Construction Appropriation Act, and the Air Force deliberately refrained from seeking such congressional sanction. There was therefore no authority in the Air Force to take the permanent interest which the trial judge has found here. In the remainder of this part we spell out these conclusions, step by step.

■ First, it is imperative that, before a compensable taking can be found by the court, there must be some congressional authorization, express or implied, for the particular taking claimed. *E. g., NBH Land Co. v. United States,* 217 Ct.Cl. 41, 44–45, 576 F.2d 317, 319–20 (1978); *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 771–72, 572 F.2d 786, 819 (1978); *Coleman v. United States,* 215 Ct.Cl. 1030, 1031 (1978) (order); *Coast Indian Community v. United States,* 213 Ct.Cl. 129, 147–48, 550 F.2d 639, 649 (1977); *Huerta v. United States,* 212 Ct.Cl. 473, 484, 548 F.2d 343, 348, *cert. denied,* 434 U.S. 828, 98 S.Ct. 108, 54 L.Ed.2d 88 (1977); *Eyherabide v. United States,* 170 Ct.Cl. 598, 606–07, 345 F.2d 565, 570 (1965).

Second, in this instance it is clear that a taking of the permanent or indefinite character now claimed by plaintiff would have required the specific consent of Congress under the annual Military Construction Program.[3]

Third, in seeking renewable one-year leases, the Air Force deliberately sought to

---

**2.** In large part the trial judge based his conclusion that the defendant intended a permanent taking on the following summary of a statement by a representative of the Department of Justice at a status conference in the 1972–73 condemnation suit in the District Court: "it was his understanding that the United States government intended to continue to condemn the property which was the subject of the action continuously in the future in similar manner in which they had done in the past and that * * * they had no intention to release the property to the owners and * * * as far as they

could determine, they would continue to condemn the property in the future ad infinitum." *Id.* at 13.

**3.** The trial judge's findings, which we adopt on this point, make this conclusion absolutely plain. He found:

"Air Force acquisitions of interests in land with a value in excess of $50,000 must be approved under the annual Military Construction Authorization Act. Authorization for a purchase of an interest in land in excess of

avoid the need for approval in an annual Military Construction Appropriations Act, and no such consent was obtained.[4]

■ Fourth, an executive agency is not authorized to take steps resulting in a compensable taking where Congress has refused to authorize such a taking or properly expects that no such taking can occur unless specified procedures involving Congress are followed. In *NBH Land Co., supra,* the court rejected an attempt to find an implied taking where Congress had rejected proposals to acquire the land under the fiscal 1975 and 1976 Military Construction requests. The court thought that, to allow judicial compensation for an inverse taking, "when the only participation by Congress has been to reject the acquisition out of hand, would strike a blow at the power of the purse" and held that, by passing the Tucker Act, "Congress did not strip itself of all control over the obligation of public funds by land takings without condemnation." 217 Ct.Cl. at 44–45, 576 F.2d at 319. That case is closely germane here where the reason Congress did not act was solely because the Air Force did not wish to give it the opportunity to decide whether or not to take a permanent or indefinite interest in the land.

Congress and the Air Force firmly expected Congress to consider all military acquisitions of the size for which plaintiff seeks compensation, and we cannot by-pass the congressional will simply because the Air Force may have thought that it could do so by condemning successive one-year terms renewable for five years.

■ Fifth, it would be an invasion of the letter and spirit of the Military Construction Program and the Military Construction Appropriation Acts for the Air Force intentionally to substitute indefinite or permanent one-year renewable tenancies for the taking of a fee or indefinite interest costing enough to require inclusion under the Military Construction Program. Congress had established a procedure for the larger expenditures which it meant and desired to be followed. *See, e. g.,* 10 U.S.C. § 2233a (as it existed prior to December 1974).[5] The Air Force could not attain the same result by camouflaging a larger taking in the guise of successive renewable leases which were not reviewable by Congress.

Sixth, the trial judge relied on the implied authority found, first, in decisions involving actual physical intrusion onto or over the claimant's land (like *Portsmouth*

$50,000 for March Air Force Base would require the approval of the intermediate command, the 15th Air Force; the SAC; the Director of Civil Engineering, Headquarters, USAF; the Deputy Chief of Staff for Programs and Resources and the Air Force Council; the Office of the Secretary of the Air Force, specifically the Deputy Assistant Secretary for Installations; the Office of the Secretary of Defense; the Office of Management and Budget; the Budget of the President of the United States; and, ultimately, Congressional authorization through the annual Military Construction Appropriations Act." Trial Judge's Opinion at 23.

"Processing a request through the procedure of the Military Construction Program requires, at a minimum, approximately 1 year. When the determination had to be made as to whether to continue the condemnation of a leasehold in the subject property that had begun in 1962, it was already too late to include an appropriation for purchase of the subject property in the 1967 Military Construction Program. For instance, a July 1967 purchase request could not result in authorization for funding to purchase before July 1968." *Id.*

"Air Force acquisition of any interest in land that has a cost of under $50,000 can be handled

as a minor land acquisition funded from the annual operation and maintenance program, and such an acquisition under $50,000 does not require authorization under a Military Construction Program." *Id.*

4. The trial judge found in a finding which we also accept:

"In reaching the decision in 1967 to condemn successive 1–year leasehold interests in the subject property, the Air Force considered that the expected use of the subject property would exceed a 5–year period. The technique of condemning a 1–year leasehold renewable for a 5–year period was chosen because leaseholds are funded under annual funds which cannot be used to enter into an obligation for longer than 1 year. This procedure allowed acquisition of the subject property without involvement in the annual Military Construction Program." *Id.*

5. This suit was brought in May 1974 and the trial judge found that the asserted "taking" of the larger interest took place in 1973, within the limitations period.

*Harbor Land & Hotel Co. v. United States,* 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287 (1922), and *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946)), and, second, in cases of a taking through severe regulation or hemming–in without physical invasion or ouster (like *Benenson v. United States,* 212 Ct.Cl. 375, 548 F.2d 939 (1977), and *Drakes Bay Land Co. v. United States,* 191 Ct.Cl. 389, 424 F.2d 574 (1970)). Neither set of precedents is apt. In those cases there was no congressional limitation or understanding that Congress itself would have to consider whether there should be a compensable acquisition of the magnitude claimed—as there is here. On the contrary, the takings judicially found were considered to be "a natural consequence of congressionally approved measures" or "the good faith implementation of a Congressional Act." *NBH Land Co., supra,* 217 Ct.Cl. at 44, 576 F.2d at 319. The express demand in this case that Congress consider and authorize a permanent or indefinite acquisition of this size makes all the difference. The Air Force was not empowered by itself to take a fee or indefinite easement on plaintiff's land, nor was it authorized to take successive one–year easements intending those easements to be permanent or without limit in time. In the face of the express requirement to seek Congressional consent in a Military Construction Authorization statute, there can be no implied authority to take a permanent or indefinite interest apart from that route.[6]

The sum of it is that, even accepting the trial judge's findings *arguendo,* we cannot see the necessary authorization for the acquisition by plaintiff of a fee or indefinite interest through this Tucker Act proceeding. As *NBH Land Company* held, it is important for us to abide by established limitations calling for congressional scrutiny of acquisitions, and not to evade those restrictions via the Tucker Act. 217 Ct.Cl. at 44, 576 F.2d at 319. We would thwart a specific congressional desire if we were to hold that the larger interest had been taken despite the absence of the necessary congressional consent.

## II

Is plaintiff left without a remedy, if the trial judge is right that the Government's method of procuring successive temporary interests leads to the virtual use by the Government, without proper payment, of a full–scale interest equal to a fee or perpetual easement? We think not. Next time around (in 1981 or 1982), plaintiff can oppose the Air Force's effort to obtain another group of successive one–year easements by urging on the District Court that the Government's attempt is not in good faith or in the exercise of proper discretion—that the Air Force intends in fact to keep a permanent or indefinite hold on the tract, and the method of successive leases deprives plaintiff of just compensation. If the District Court agrees with that contention, it should, we think, reject the defendant's condemnation suit on the ground that a permanent interest is not obtainable by these successive temporary interests and that the Government is trying to evade the mandatory requirement of seeking and getting congressional approval for the greater interest. *See United States v. 64.88 Acres of Land,* 244 F.2d 534, 536 (3rd Cir. 1957); *Simmonds v. United States,* 199 F.2d 305, 307 (9th Cir. 1952); *United States v. Meyer,* 113 F.2d 387, 392 (7th Cir.), *cert. denied,* 311 U.S. 706–07, 61 S.Ct. 174, 85 L.Ed. 459 (1940).[7] In that event, the Government would be unable to secure a permanent or

---

**6.** We note in passing (a) that, unlike *Portsmouth* and *Causby,* there was no existing physical intrusion onto plaintiff's land through Air Force activities on adjacent March Air Force Base, and (b) that it is unlikely that the mere danger from the adjacent ammunition dump, not involving any existing invasion of plaintiff's land, would constitute, in itself, a Fifth Amendment taking. *See Avery v. United States,* 165 Ct.Cl. 357, 362–66, 330 F.2d 640, 643–45 (1964).

**7.** In the 1972–1973 District Court condemnation action, present defendant moved to strike present plaintiff's defense that the landowner may challenge the Government's denomination of its taking in the District Court proceeding as a succession of one–year easements. Unfortunately, present plaintiff filed a notice of non–opposition to the motion, and it was granted by the District Court. Present plaintiff then filed suit in this court. But plaintiff's mistake in

indefinite interest in the land without going through the route of the Military Construction Program. If despite the court's refusal to allow condemnation in the same form as before, the Air Force tries to implement or enforce a temporary easement, plaintiff will have the remedy of an injunction.[8] If the District Court disagrees with plaintiff, the latter will have its right of appeal. We do not think that plaintiff is on the horns of an insoluble dilemma.

## CONCLUSION OF LAW

The court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

---

agreeing to the Government's motion cannot give us authority we do not have. Nor are we estopped by the proceedings in the District Court from following the course we believe to be compelled by the law.

8. Ordinarily, whenever there is no authority for a taking or intrusion, the claimant, although unable to obtain compensation, can seek an injunction or a declaratory judgment against the unauthorized governmental activities.