Frederick PAUL

v.

The UNITED STATES.

Barry JACKSON and Thomas Fenton

v.

The UNITED STATES

Nos. 566–77, 593–77.

United States Court of Claims.

Aug. 25, 1982.

Blair F. Paul, Seattle, Wash., attorney of record, for plaintiffs. Paul, Johnson, Paul & Riley, Seattle, Wash., of counsel.

Susan V. Cook, Washington, D. C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D. C., for defendant. Thomas J. Riley, Washington, D. C., of counsel.

Before DAVIS, KASHIWA and SMITH, Judges.

ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

DAVIS, Judge:

Plaintiffs are attorneys who say that they entered into valid contracts with Alaska Native groups and entities to perform legal services (in connection with the Natives' land claims in Alaska), but did not receive the payment to which they claim to be entitled under those fee-arrangements because the Alaska Native Claims Settlement Act of 1971, 43 U.S.C. §§ 1601 et seq. (the Settlement Act), severely restricted such attorneys' compensation. Their claim here is that this part of the Act amounted to a taking of their property (the pre-existing right to fees) for which they should receive just compensation from the United States. Both parties here moved for summary judgment,[1] and after oral argument we hold that the case should be decided for the defendant without remand for fact-finding.

## I

The agreements plaintiffs claim to have made with Alaska Native bodies were consummated in 1966–1968. There is a sharp dispute over the validity of all these agreements except three made by plaintiffs Jackson and Fenton (with the Alaskan villages of Minto, Nenana, and Tanacross). For the purposes of this case, however, we assume (without in any way deciding) that all of the fee-arrangements plaintiffs claim to have made were valid and accepted (or assumed to be accepted) by the Interior Department. Each of the agreements contained a compensation clause giving plaintiffs contingent compensation (contingent on the Natives' receipt of benefits) in an amount "equitably due," but not to exceed 10 percent of the recovery.

We shall also assume, without deciding, that (a) plaintiffs performed substantial legal services (in an amount worth more than they received under the Settlement Act, see infra) and (b) their clients received benefits in an amount which could sustain greater recovery by plaintiffs than they actually obtained under the Settlement Act.[2]

In 1971, Congress enacted the Settlement Act under which the Natives of Alaska received, without need for litigation, large amounts of land and money in settlement of their claims of aboriginal land ownership. See generally, United States v. Atlantic Richfield Co., 612 F.2d 1132 (9th Cir.), cert. denied, 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 113 (1980). The considerable sums of money provided by the Act were deposited in the Alaska Native Fund. Section 6(a) of the Settlement Act, 43 U.S.C. § 1605(a).[3] The Fund has been distributed as called for by the Settlement Act.

The Act outlined in detail the method for paying attorneys who had participated in the legislative settlement or in the court prosecution (or before the Indian Claims Commission) of a claim required to be dismissed by the Act as part of the settlement. Section 20, 43 U.S.C. § 1619. Claims of that type were to be presented to the Chief Commissioner of this court who would hear and determine them. The total amount of legal fees, however, was limited by Congress to $1,900,000 ($100,000 going to consultants), to be paid out of the Alaska Native Fund; if the approved claims exceeded that aggregate amount, the Chief Commissioner was to authorize payment of the claims on a pro rata basis. Section 20(d)(4), 43 U.S.C. § 1619(d)(4). The Act also prohibited receipt by a claiming attorney of additional compensation (of the type properly includable in a fee claim under the Act) and made it a criminal offense to receive .

---

1. Plaintiffs' motions are for partial summary judgment involving only certain of plaintiffs' claimed fee-arrangements, and only the question of liability. Defendant's motion is for full summary judgment and asks for the entire dismissal of both petitions.

2. Defendant does not concede these assumptions.

3. This money came from two sources: (1) congressional appropriations totalling $462.5 million by fiscal 1981, and (2) contributions (ultimately totalling $500 million) by the State of Alaska and the United States from mineral leasing receipts. See section 9 of the Settlement Act, 43 U.S.C. § 1608.

such extra remuneration. Section 20(f)(1) and (2), 43 U.S.C. § 1619(f)(1) and (2). Finally, Congress forebade payment of any part of the revenues and land granted by the Settlement Act under any attorney contract providing for a percentage fee, and made such fee contracts unenforceable against Alaskan Natives. Section 22(a), 43 U.S.C. § 1621(a).

The three plaintiffs filed claims with the Chief Commissioner under the Settlement Act. In December 1974, all the attorneys who filed such claims agreed on the portion of the total compensation each should receive.[4] Under this stipulation, and after taking account of the compensable legal work performed, the Chief Commissioner allowed plaintiff Paul (and his firm) the amount of $697,000 (Paul receiving $276,000 personally). Jackson and Fenton received $130,082. The maximum of $1,900,000 was divided among all the claiming attorneys.

## II

Before the present suit was pursued, plaintiffs sought through other litigation to recover additional sums for their legal work. Paul sued—naming as defendants several federal officials, Alaskan entities organized under the Settlement Act, and the parties to his retainer contracts—in the Western District of Washington. He sought all kinds of relief, including a holding that sections 20 and 22 of the Settlement Act, *supra*, were unconstitutional. The District Court ruled that it had no jurisdiction because section 10 of the Settlement Act confined litigation challenging the constitutionality of the Act to timely

suits in the District of Alaska.[5] In 1980, the Ninth Circuit affirmed. *Paul v. Andrus*, 639 F.2d 507. Both the District Court and the Court of Appeals held the time and venue provisions of section 10 to be valid, even though the limitation of party plaintiffs to Alaska officials might well be unconstitutional. Paul's suit was dismissed because he filed it nearly three and one-half years after the time limitation (December 18, 1972) established in section 10, and he did not file suit in the District of Alaska.[6]

The current suits for just compensation were reactivated and pursued after the failure of the District Court litigation.

## III

The thrust of plaintiffs' present position is that (a) the limitations on attorney compensation embodied in sections 20 and 22 of the Settlement Act (see Part I, *supra*) are invalid unless the Act is construed as an eminent domain taking of plaintiffs' pre-existing contract rights for which they were not properly compensated through the Chief Commissioner's proceedings in this court, and (b) the Settlement Act must therefore be understood as such a taking. There are at least three major defects in that contention.

█ The first is that plaintiffs are now precluded from challenging the constitutionality of sections 20 and 22, and we are precluded from considering those provisions as invalid. Not only is the Ninth Circuit's ruling in *Paul v. Andrus* binding on plaintiffs under the principles of former adjudication,[7] but we agree with that holding and

---

4. The total claims exceeded the $1,900,000 allowable.

5. Section 10, 43 U.S.C. § 1609(a), provided that the complaint in such a suit had to be filed within one year of December 18, 1971, and in the District Court for the District of Alaska, and had to be "commenced by a duly authorized official of the State" of Alaska.

6. Jackson and Fenton filed a late suit in the District of Alaska seeking additional compensation. The District Court decided that case adversely to the plaintiffs on a number of grounds. 485 F.Supp. 1243 (1980). After *Paul*

*v. Andrus*, Jackson and Fenton dismissed their appeal to the Ninth Circuit, recognizing that *Paul v. Andrus, supra*, controlled their case as well.

7. Several federal officials were parties defendant in that suit (Andrus was the Secretary of the Interior) and they were sued because of their official status. *Paul v. Andrus* meets the former rule that the defense of prior adjudication applies only where there is mutuality. In addition, plaintiffs are bound under the more modern concept that one full chance to litigate is normally enough, even in the absence of mutuality.

believe it to be correct. Congress deliberately adopted the time and venue restrictions of section 10 because, as that provision explicitly puts it: "The purpose of this limitation on suits is to insure that, after the expiration of a reasonable period of time, the right, title, and interest of the United States, the Natives, and the State of Alaska will vest with certainty and finality and may be relied upon by all other persons in their relations with the State, the Natives, and the United States." Section 10.

That stated objective, as *Paul v. Andrus* said, is a rational ground for the time and venue restrictions (regardless of the possible unconstitutionality of the restriction to the State of Alaska of the sole right to make all constitutional challenges).[8] Under the Supreme Court's jurisprudence, reasonable time and venue limitations of that type are constitutionally acceptable. *See, e.g., Lockerty v. Phillips*, 319 U.S. 182, 63 S.Ct. 1019, 87 L.Ed. 1339 (1943); *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944).

Plaintiff Paul made no showing in *Paul v. Andrus* why he could not have filed a timely suit in Alaska attacking sections 20 and 22, and plaintiffs here have done no better. Having failed to pursue the special route Congress opened to them, they are barred from asking us to consider sections 20 and 22 as invalid in any way. Conversely, we cannot take that view, without transgressing Congress' express direction as to the method for constitutional attacks. It follows that we have no basis in the putative invalidity of sections 20 and 22 (considered by themselves) for holding that Congress must have exercised its eminent domain powers in order to save those otherwise (assumedly) invalid provisions.

## IV

▮ The second, independent flaw in plaintiffs' argument is that, even if we are wholly free to assess the validity of sections 20 and 22, we cannot see those provisions as unconstitutional. There is a long history of legislation and administrative action limiting an attorney's share of the funds he helped to procure from the Federal Government, despite a private contract he may have, or have had, with the client for whom he obtained the federal money. In the field of native rights, Indian statutes are prime examples, especially the Indian Claims Commission Act, 25 U.S.C. § 70 *et seq.* (1976) and the regular practice of the Bureau of Indian Affairs (in approving attorneys' contracts) to restrict the amount of legal compensation. The Supreme Court has repeatedly upheld such limitation provisions in various contexts. *Kendall v. United States*, 74 U.S. (7 Wall) 113, 114, 118, 19 L.Ed. 85 (1868); *Frisbie v. United States*, 157 U.S. 160, 165–66, 15 S.Ct. 586, 588, 39 L.Ed. 657 (1895); *Ball v. Halsell*, 161 U.S. 72, 16 S.Ct. 554, 40 L.Ed. 622 (1896); *Capital Trust Co. v. Calhoun*, 250 U.S. 208, 213–14, 218–20, 39 S.Ct. 486, 486–87, 488–89, 63 L.Ed. 942 (1919); *Calhoun v. Massie*, 253 U.S. 170, 173–75, 176–77, 40 S.Ct. 474, 474, 476, 64 L.Ed. 843 (1920); *Margolin v. United States*, 269 U.S. 93, 101–2, 46 S.Ct. 64, 65, 70 L.Ed. 176 (1925); *Hines v. Lowrey*, 305 U.S. 85, 91, 59 S.Ct. 31, 35, 83 L.Ed. 56 (1938). The restrictive legislation can apply to pre-existing attorney-client contracts as well as to those made after the limiting legislation was passed. *Capital Trust Co. v. Calhoun, supra*, 250 U.S. at 219, 39 S.Ct. at 489; *Calhoun v. Massie, supra*, 253 U.S. at 176–77, 40 S.Ct. at 476.

The core reasons for the validity and retroactive application of such provisions are that (a) the payment of federal funds cannot be made without legislation consenting to suit against the United States or authorizing the payment of federal money to the claimants, (b) Congress has the authority to mold and limit its consent to suit and its award of monies, and (c) in making attorney or client contracts the parties must be aware, particularly in view of much past practice (now well over a century old), that Congress could be "unwilling to enact any legislation without assuring itself that the

---

**8.** The Settlement Act contains a severance clause which would separate the party limitation from the time and venue restrictions. *Paul v. Andrus, supra*, 639 F.2d at 509.

benefits thereof would not inure largely to others than those named in the act." *Calhoun v. Massie, supra*, 253 U.S. at 176–77, 40 S.Ct. 476.

This consistent line of decisions sustaining restrictions on attorney fees (where federal monies are involved) directly controls the present cases. The Settlement Act obviously provided federal funds for Alaska Natives and plaintiffs admit that the objectives of the attorney restrictions in sections 20 and 22 were to protect and maximize the amount of the settlement to be received by the Natives themselves. *See* H.Conf. Rep.No. 746, 92d Cong. 1st Sess. 47 (1971), U.S.Code Cong. & Admin.News 1971, p. 2192; S.Rep.No. 405, 92d Cong. 1st Sess. 174 (1971). If there be any requirement that the amount received by the attorney under the statute be reasonable (a condition not enunciated in any of the Supreme Court opinions), we cannot say that the sums received by plaintiffs as a result of the Chief Commissioner's proceedings (see Part I, *supra*) under section 20 were less than the reasonable minimum.[9]

Plaintiffs seek to differentiate themselves on two grounds from the earlier decisions limiting fees. One basis is that the First Amendment requires minority peoples like Alaskan Natives to be able to obtain legal representation in order to vindicate their land rights, and that the restrictions of sections 20 and 22 improperly interfere with that First Amendment right. We may assume that the First Amendment is somehow implicated in the Natives' legal representation, but we cannot agree with plaintiffs that there had to be a "clear and present danger" before Congress could impose the attorney-fee limitations of the Set-tlement Act. Any connection between those limitations and the Natives' First Amendment rights was tenuous at best. Not only was there no prohibition of any kind on pursuit of any activities by either Natives or their lawyers, but even if the fee provision constituted some type of "indirect restraint" there was and could be no discouragement of any of their activities respecting that particular settlement—the Settlement Act came *after* those activities, not before. If the Act had any effect in discouraging the future retaining of lawyers by Indians or Natives, that impact would not bear on the Natives' rights involved in the Alaskan Settlement Act. Nor were plaintiffs' own rights to represent their clients affected by the Act in any way whatever. More than that, the history of fee limitations (where federal money is involved) shows little deterrent effect on the obtaining of lawyers by those seeking federal funds, but rather a solid and continued belief in Congress that serious abuses could and would result from the failure to establish fee limitations. We cannot believe that the Indian Claims Commission Act, for instance, has trenched on the First Amendment rights of the many tribes and groups covered by that statute.[10]

The second ground plaintiffs urge for excepting their case from the established decisions upholding fee limitations is that here Congress' power was circumscribed because it had previously authorized the Interior Department (in 25 U.S.C. § 81, "Contracts with Indian Tribes or Indians") to approve Indian and Native client-arrangements, and plaintiffs' contracts had been so approved.[11] Relying on *Arizona Grocery Co. v. Atchison, Topeka and Santa Fe Railway Co.*, 284 U.S.

---

**9.** At the oral argument, counsel for plaintiffs said that Paul received compensation in the Chief Commissioner's proceedings at the rate of $10–12 per hour (present value). For the pre-1971 period, involved here, that does not seem outrageous, even if Paul would have received more if his fee contracts were fully enforceable.

**10.** Plaintiffs cite *United Mine Workers of America v. Illinois State Bar Association*, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) (and earlier decisions in the same line), but there the Court found that the substantial impairment of First Amendment rights definitely outweighed the remote possibility of the harm sought to be prevented by those particular restrictions.

**11.** Defendant admits only that three of the Jackson-Fenton contracts were so approved, but we have assumed *arguendo* (see Part I, *supra*) that all of plaintiffs' pertinent contracts were so approved, in actuality or in legal effect.

370, 52 S.Ct. 183, 76 L.Ed. 348 (1932), plaintiffs say that, where Congress' delegate has, prior to performance, regulated and approved (under 25 U.S.C. § 81) a contract between an attorney and his client (a contract contemplating recovery from federal funds), the Congress cannot subsequently, after performance, abrogate or restrict the attorney's "vested" contractual rights—at least without paying just compensation.

Though plaintiffs may be right that no previous fee-limitations case involved prior governmental approval of the fee arrangement, this difference is not significant. As the Supreme Court specifically said in *Calhoun v. Massie, supra*, 253 U.S. at 176, 40 S.Ct. at 476, parties to such fee contracts must know that Congress could later impose limitations, and had often done so. Nothing in 25 U.S.C. § 81 or in Interior approval (actual or presumed) of plaintiffs' contracts indicates that Congress could not thereafter exercise that traditional power to restrict legal fees payable with respect to awards or grants of federal monies. When Congress—beginning in the early 1870s—passed the various versions of what is now § 81 (requiring executive approval of Indian contracts), it did not constitutionally bar itself from later enacting the fee limitations it subsequently considered desirable in particular or a class of situations. Executive approval under § 81 was to be a first screen for possible abuses, not a grant of complete and vested rights to the attorney.

The only decision plaintiffs cite for their novel position is *Arizona Grocery Co.*, which was quite different. The Court there held that, under the statutes then binding the Interstate Commerce Commission, that agency could not reduce, in a reparations proceeding, a rate it had previously promulgated as reasonable, lawful, and legal.[12] The decision had no constitutional overtones at all, and rested wholly on the Court's construction of the then governing Congressional legislation dealing with the ICC. *See* 284 U.S. at 381, 383, 390, 52 S.Ct. at 183,

186. Plaintiffs mistakenly see the *Arizona Grocery* opinion as concerned with "vested" rights immune to later change by Congress itself. Instead, the case involved only the power Congress had itself given to the Commission.

The result is that, in our view, sections 20 and 22 of the Settlement Act were valid statutory provisions, supported by established legislative practice and several controlling decisions of the highest court. The converse is that plaintiffs had no "vested" interest in their original fee-arrangements of a type that could be "taken" only on payment of just compensation. *See, e.g., Agins v. Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980).

## V

The third error in plaintiffs' position is that there is no ground for reading into the Settlement Act an eminent domain taking of plaintiffs' pre-existing rights to fees. For such a taking there must be the Congressional purpose or authorization, express or implied, to *take* the property. *See Southern California Financial Corp. v. United States*, 225 Ct.Cl. ——, ——, 634 F.2d 521, 523 (1980), *cert. denied*, 451 U.S. 937, 101 S.Ct. 2016, 68 L.Ed.2d 324 (1981). But the Settlement Act does not say or intimate, in any way, that Congress desired to take those rights; nor is any such suggestion in the Act's legislative history. In a word, nothing in the statute or its background supports a taking claim enforceable in this court. Nor is it strange that we find nothing. If, as we have held (in Parts III and IV, *supra*), the fee limitations of sections 20 and 22 must be considered valid, there would obviously be little or no reason for Congress to take plaintiffs' rights by eminent domain (though it could do so if it made that purpose very clear, *see. e.g., United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 734–742, 70 S.Ct. 955, 960–64, 94 L.Ed. 1231 (1950)). On the other hand, if the fee limitations are invalid (as plaintiffs

---

**12.** And could not order the excess found in the reparations proceeding to be refunded to the shipper.

strongly argue), Congress, having provided a special mechanism to test the validity of any part of the Act (see Part II, *supra*), is very unlikely to have embedded in the Act, without saying anything, a separate implied taking of plaintiffs' rights as an alternative to outright invalidation of sections 20 and 22. It is very difficult to infer an implied taking from invalid legislation which, by definition, is legislation beyond the authority of Congress to enact. Injunctive and declaratory relief may be available to prevent enforcement of the unconstitutional provisions, but a taking can hardly be found without some good indication that Congress would want that result if its handiwork turned out to be invalid without just compensation being paid. Congress might well be satisfied simply to have the offending provisions cut off and declared unenforceable, without more.

Plaintiffs invoke the *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), and *Dames & Moore v. Regan*, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), as precedents for finding a taking in the Settlement Act. Neither decision is apposite. *Regional Rail Reorganization* involved an "erosion taking" (which the Court found a "distinct possibility," 419 U.S. 124, 95 S.Ct. at 349) and a possible "conveyance taking" in the course of proceedings mandated by the Regional Rail Reorganization Act of 1973 if a Tucker Act suit for just compensation were unavailable.[13] The court held that the Tucker Act "is available to provide just compensation for any 'erosion taking' effected by the Rail Act" (419 U.S. at 136, 95 S.Ct. at 355), as well as for a "conveyance taking" (419 U.S. at 148–56, 95 S.Ct. at 361–65).

The first difference from the present case is that it was probable that the Rail Act would be invalid if the Tucker Act were not triggered by a possible "erosion taking" or "conveyance taking." *See* 419 U.S. at 135, 155–56, 95 S.Ct. at 354, 364–65. Here, on the other hand, the Settlement Act was fully valid (as we have shown in Parts III and IV, *supra*) without any provision for compensation greater than plaintiffs have already received. In *Regional Rail Reorganization*, it was therefore probably a prerequisite to the Rail Act's validity to find that just compensation could be had in this court if the feared "erosion" or less-than-adequate "conveyance" occurred; in this case, in contrast, that remedy is wholly unnecessary in order to sustain the Act. Secondly, the *Regional Rail Reorganization* Court believed it very highly probable that Congress, in adopting the Rail Act, wanted to grant the claimant railway the constitutional minimum of just compensation, and that Congress thought that it had done so. *See* 419 U.S. at 128–29, 130–31, 148, 95 S.Ct. at 351, 352, 361. Invocation of the Tucker Act remedy would directly foster that prime legislative purpose. In the current cases, on the contrary, it was plainly not at all the Congressional purpose to effect a taking or to grant plaintiffs the full constitutional measure of just compensation for their prior legal work and it is therefore inconsistent with the Congressional objectives to imply a taking vindicable via the Tucker Act.

There are comparable distinctions from *Dames & Moore, supra*, which upheld the agreement and Executive Orders ending the Iranian hostage crisis, and ruled that, if a constitutional taking occurred through the suspension of claims and receipt from the Iran-United States Claims Tribunal of less than their proper value, this court would be open to the claimants. 453 U.S. at 688–90, 101 S.Ct. at 2990–92. That decision held only that, if a constitutional taking actually occurred, the Tucker Act would furnish a remedy.[14] Here, there was certainly no taking if sections 20 and 22 of the Settlement Act were (or are to be con-

---

**13.** The Rail Act contained no provision for compensation for such "erosion" or "conveyance" takings, and it was argued to the Supreme Court that the heart of the Rail Act was therefore unconstitutional.

**14.** The Court expressly refused to decide whether or not there was a constitutional taking. 453 U.S. at 688–89, 101 S.Ct. at 2990–92.

sidered) valid in themselves,[15] and if those portions of the Act are invalid there is no ground, as we have said, for thinking that Congress wished the Tucker Act to substitute for an injunction or declaratory judgment ruling the provisions separable and unconstitutional.

## CONCLUSION

For these reasons, plaintiffs are not entitled to recover. Their motions for partial summary judgment are denied, the defendant's motion for full summary judgment is granted, and the petitions are dismissed.

---

**15.** In *Dames & Moore*, the Court held that certain of the President's actions with respect to attachments during the Iranian crisis were valid, and therefore that petitioner did not acquire any "property" interests in its attachments of the sort that would support a constitutional claim for compensation. 453 U.S. at 674 n.6, 101 S.Ct. at 2984 n.6. The same is true here if, as we have held, sections 20 and 22 are valid.