685 F.Supp. 1108 (1988)
Maurice and Dolores GLOSEMEYER, et al., Plaintiffs,
v.
MISSOURI-KANSAS-TEXAS RAILROAD COMPANY, et al., Defendants.
No. 86-2508C(6).
United States District Court, E.D. Missouri.
May 10, 1988.
*1109 *1110 Ronald R. McMillin, Carson, Coil, Riley, McMillin, Levine & Veit, Jefferson City, Mo., Kemper Coffelt, Clayton, Mo., for plaintiffs.
Henry D. Menghini, Evans & Dixon, St. Louis, Mo., for M-K-T.
Edward F. Downey, Asst. Atty. Gen., Jefferson City, Mo., for Brunner & DNR.
Leland B. Curtis, Harold Bamburg, St. Louis, Mo., Charles H. Montange, Washington, D.C., for intervenors.
John J. Rademacher, Gen. Counsel, Richard L. Krause, Asst. Counsel, American Farm Bureau Federation, Park Ridge, Ill., Albert H. Hamel (local counsel), Lashly, Baer & Hamel, St. Louis, Mo., for American Farm Bureau Fed.
Joseph Moore, Asst. U.S. Atty., St. Louis, Mo.
Mark Pollot, Sp. Asst. to the Acting Asst. Atty. Gen. Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C.
James E. Brookshire, Deputy Chief, Litigation Section, Land & Natural Resources Div., Dept. of Justice, Washington, D.C.

MEMORANDUM
GUNN, District Judge.
This action involves a challenge to Section 8(d) of the National Trails System Act, as amended, 16 U.S.C. § 1247(d) ("§ 1247(d)"). Section 1247(d), enacted in furtherance of a national policy to preserve established railroad rights-of-way for future reactivation of rail service, authorizes the Interstate Commerce Commission ("ICC") to enter orders permitting such rights-of-way to be used on an interim basis as recreational trails. Plaintiffs, adjacent landowners to a railroad right-of-way subject to an ICC order entered pursuant to § 1247(d), challenge the section on various federal and state constitutional and statutory grounds.
In 1983 Congress amended Section 8 of the National Trails System Act of 1968 by adding a provision for the interim use of railroad rights-of-way as recreational trails.[1] National Trails System Act Amendments of 1983, Pub.L.No. 98-11, § 208 (1983), (codified at 16 U.S.C. § 1247(d)). In September 1986 the Missouri-Kansas-Texas Railroad Company ("M-K-T"), pursuant to 49 U.S.C. § 10903, *1111 filed an application with the ICC to abandon approximately 200 miles of a railroad right-of-way between Machens and Sedalia, Missouri. In October 1986 the Missouri Department of Natural Resources ("DNR") filed a protest to M-K-T's application with the ICC in which it invoked § 1247(d) and requested the ICC to issue a Certificate of Interim Trail Use ("CITU") to it pursuant to § 1247(d) and the regulations promulgated thereunder. 49 C.F.R. § 1152.29 (1986). The CITU would authorize and direct interim use of the railroad right-of-way for a recreational trail while requiring retention and maintenance of the railroad corridor for reinstatement of rail service in the future. On March 6, 1987, the ICC concluded that the railroad should be relieved of its present service obligations and, to facilitate preservation of the line and its use in the interim as a trail, authorized the issuance of a CITU. Missouri-Kansas-Texas Railroad Company AbandonmentSt. Charles, Warren, Montgomery, Calloway, Boone, Howard, Cooper and Pettis County, Mo., ICC No. AB-102 (Sub-No. 13), served March 16, 1987. On April 22, 1987, the ICC issued the CITU. Missouri-Kansas-Texas Railroad CompanyAbandonmentSt. Charles, Warren, Montgomery, Calloway, Boone, Howard, Cooper and Pettis County, Mo., ICC No. AB-102 (Sub-No. 13), served April 27, 1987.
As a consequence plaintiffs filed the present action in which they challenge the transfer of interest in the railroad right-of-way from M-K-T to DNR. Plaintiffs named M-K-T, DNR and Frederick A. Brunner, the director of DNR, as defendants. However, by subsequent order of the Court, the United States of America and eleven environmental and recreational interest groups ("Interest Groups") were permitted to intervene as defendants.[2] In addition, the Court granted the American Farm Bureau Federation and the Missouri Farm Bureau Federation leave to file briefs in support of plaintiffs as amici curiae.
In their complaint, plaintiffs allege that their predecessors in interest granted a right-of-way over their property to the predecessors in interest of M-K-T. A representative conveyance attached as Exhibit B to their complaint, and executed by the predecessors in interest of one of the plaintiffs and M-K-T, indicates that the right-of-way was conveyed "for the purpose of a Railroad, and for no other purpose" and that the railroad is only "to have and hold" this right-of-way "for the purpose of establishing, constructing and maintaining a Railroad on the said lands ... conveyed...." As the alleged owners of the fee underlying the right-of-way, plaintiffs contend that but for § 1247(d) their reversionary interests in the right-of-way would have vested in them under state law upon M-K-T's decision to abandon its line and that M-K-T would therefore have no interest in the right-of-way to transfer to DNR.
Plaintiffs ostensibly challenge § 1247(d), the ICC regulations implementing § 1247(d) and the ICC order of March 6, 1987 applying § 1247(d) and the regulations to the M-K-T right-of-way. Plaintiffs advance numerous theses in support of their challenge, primarily that § 1247(d) and the ICC's regulations and order of March 6, 1987 constitute: (1) an invalid exercise of the commerce clause power under Article I, Section 8 of the United States Constitution; (2) an impermissible impairment of the obligation of contracts under Article I, Section 10 of the United States Constitution; (3) a violation of due process under the fifth and fourteenth amendments of the United States Constitution; (4) a taking of property without just compensation under the fifth amendment of the United States Constitution; and (5) a violation *1112 of various Missouri constitutional and statutory provisions. As a result plaintiffs request the Court to declare § 1247(d) and the ICC's regulations and order of March 6, 1987 unconstitutional and to quiet title in plaintiffs of their respective interests in the M-K-T right-of-way. The Interest Groups have also filed a counterclaim against plaintiffs in which they request the Court to declare § 1247(d) and the ICC's regulations and order constitutional.
Presently before the Court are plaintiffs' motion for summary judgment,[3] defendants M-K-T, DNR and Brunner's motion for summary judgment, defendant Interest Groups' motion for judgment on the pleadings or, in the alternative, for summary judgment, and defendant United States' motion for partial summary judgment. For the following reasons, and upon consideration of the arguments advanced by the parties, the Court grants defendants' motions for summary judgment and denies plaintiffs' motion for summary judgment.

A. Jurisdiction

The Court has jurisdiction to consider plaintiffs' challenge to § 1247(d) under 28 U.S.C. §§ 1331 and 1337(a). However, the Court is without jurisdiction to consider their challenge to the ICC's regulations implementing § 1247(d) and to its order of March 6, 1987 applying § 1247(d) and the implementing regulations to the M-K-T right-of-way. Under 28 U.S.C. § 2321, proceedings "to enjoin or suspend, in whole or in part, a rule, regulation, or order of the [ICC]" are to be brought in the federal circuit courts of appeal in accordance with the Hobbs Act, 28 U.S.C. § 2341, et seq. Under the applicable provision of the Hobbs Act, the federal circuit courts of appeal have exclusive jurisdiction to "... determine the validity of ... all rules, regulations, or final orders of the [ICC] made reviewable by [28 U.S.C. § 2321]." 28 U.S. C. § 2342. Thus the federal circuit courts of appeal have exclusive jurisdiction to consider plaintiffs' challenge to the ICC's implementing regulations and order of March 6, 1987. Accordingly, the Court considers only plaintiffs' challenge to § 1247(d) and dismisses so much of their complaint which seeks to challenge the ICC's regulations and order.

B. The Commerce Clause

Plaintiffs and amici curiae contend that Congress exceeded its power under the commerce clause by enacting § 1247(d) because the regulatory scheme embodied in § 1247(d) is not reasonably related to Congress's avowed purpose of preserving railroad rights-of-way for future reactivation of rail service. By electing to postpone railroad abandonments and the vesting of landowners' reversionary interests in railroad rights-of-way, Congress "cheat[ed] landowners out of their reversionary rights" under the pretext of "railbanking" so as to encourage the development of recreational trails. See Amici Curiae's Memorandum in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff-Intervenor's Motion for Summary Judgment at 14-21. The Court finds such an argument to be without merit.[4]

*1113 (i) Standard of Review

A court's task in evaluating a particular exercise of congressional power under the commerce clause is "relatively narrow." Hodel v. Virginia Surface Mining & Reclamation Association, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981). First, "[t]he court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding." Hodel, 452 U.S. at 276, 101 S.Ct. at 2360 (citations omitted). Second, when the court satisfies itself that the regulated activity does affect interstate commerce, it must determine "whether `the means chosen by [Congress is] reasonably adapted to the ends permitted by the Constitution.'" Hodel, 452 U.S. at 276, 101 S.Ct. at 2306 (quoting Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 262, 85 S.Ct. 348, 360, 13 L.Ed.2d 258 (1964)). "The judicial task is at an end once the court determines that Congress acted rationally in adopting a particular regulatory scheme." Hodel, 452 U.S. at 276, 101 S.Ct. at 2360. Such limited judicial review is required as the commerce clause constitutes a "grant of plenary authority to Congress." Hodel, 452 U.S. at 276, 101 S.Ct. at 2360. See also State of Texas v. United States, 730 F.2d 339 (5th Cir.), cert. denied, 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984) (applying "minimal scrutiny" to uphold under the commerce clause the constitutionality of §§ 201, 202, 203 and 214 of the Staggers Rail Act of 1980, 49 U.S.C. §§ 10501, 10701a, 10709 and 11501).
In their challenge to § 1247(d), plaintiffs and amici curiae do not contend that § 1247(d) is a regulation of an activity which does not affect interstate commerce. Rather, they contend that the regulatory scheme embodied in § 1247(d) is not reasonably adapted to Congress' announced purpose of preserving soon-to-be abandoned railroad rights-of-way for future reactivation of rail service. However, as Congress' prior legislation with respect to railroad abandonments and the circumstances surrounding its enactment of § 1247(d) demonstrate, Congress rationally elected to postpone railroad abandonments and to encourage interim trail use as a means of furthering its "railbanking" purpose. Simply stated, § 1247(d) evidences a "reasonable relation[ship] between the means selected and the end desired." State of Texas v. United States, 730 F.2d 339, 350 (5th Cir.), cert. denied, 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984).

(ii) Railroad Abandonments: The Statutory Framework

By enacting the Interstate Commerce Act, 49 U.S.C. § 10101, et seq., Congress granted the ICC broad authority to regulate the activities of interstate rail carriers, including their decisions to abandon a railroad line. Chicago & N.W. Transportation Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 313, 101 S.Ct. 1124, 1128, 67 L.Ed.2d 258 (1981). Indeed, Congress vested in the ICC "exclusive" and "plenary" authority over railroad abandonments. Kalo Brick, 450 U.S. at 321, 101 S.Ct. at 1132. Such authority "is critical to the congressional scheme, which contemplates comprehensive administrative regulation of interstate commerce." Kalo Brick, 350 U.S. at 321, 101 S.Ct. at 1132.
Generally speaking, a railroad may only discontinue operations or abandon a railroad line if it obtains the approval of the ICC. 49 U.S.C. § 10903.[5] Section 10903 provides in pertinent part as follows:
(a) A rail carrier providing transportation subject to the jurisdiction of the [ICC] ... may
(1) abandon any part of its railroad lines; or
(2) discontinue the operation of all rail transportation over any part of its railroad lines; *1114 only if the [ICC] finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance....
In determining whether to approve a proposed abandonment or discontinuance, the ICC "must balance `the interests of those now served by the present line on the one hand, and the interests of the carrier and the transportation system on the other.'" Kalo Brick, 450 U.S. at 321, 101 S.Ct. at 1132 (quoting Purcell v. United States, 315 U.S. 381, 384, 62 S.Ct. 709, 711, 86 L.Ed. 910 (1942)). Once the ICC strikes the balance, "its conclusion is entitled to considerable deference." Kalo Brick, 450 U.S. at 321, 101 S.Ct. at 1132.
Under 49 U.S.C. § 10905, and whenever the ICC finds that the public convenience and necessity require or permit abandonment or discontinuance of a particular railroad line, the ICC must publish its finding in the Federal Register so as to afford a person who wishes to prevent the abandonment or discontinuance an opportunity either to purchase or subsidize the line for continued operation. 49 U.S.C. § 10905(c); Hayfield N.R.R. v. Chicago & N.W. Transportation Co., 467 U.S. 622, 629, 104 S.Ct. 2610, 2615, 81 L.Ed.2d 527 (1984). If an offer is forthcoming, the railroad and the offeror will be granted an opportunity to negotiate an agreement. If an agreement is not reached, either party may request the ICC to set the terms and conditions for the transaction. 49 U.S.C. § 10905(e). When the ICC sets the terms and conditions, the railroad is bound by them, but the offeror is not. 49 U.S.C. § 10905(f). The purpose of 49 U.S.C. § 10905 is to "accommodate the conflicting interests of railroads that desire to unburden themselves quickly of unprofitable lines and shippers that are dependent upon continued rail service." Hayfield, 467 U.S. at 630, 104 S.Ct. at 2615.
Finally, and again only when the ICC determines that the public convenience or necessity require or permit abandonment or discontinuance of a particular railroad line, the ICC must find whether the particular line is "suitable for use for public purposes, including highways, other forms of mass transportation, conservation, energy production or transmission, or recreation." 49 U.S.C. § 10906. If the ICC finds that the line is suitable for use for public purposes, it "may be sold, leased, exchanged or otherwise disposed of" only upon the conditions imposed by the ICC. Such conditions may include a prohibition against the sale of the line for up to 180 days unless the line has first been offered for sale, upon reasonable terms, for public purposes. In contrast to its power under § 10905, however, the ICC cannot set the terms upon which the railroad must sell the line. It may only postpone abandonment for up to 180 days.
As a general matter once the ICC has authorized an abandonment pursuant to a certificate of abandonment, the ICC's jurisdiction over the railroad line is terminated. Hayfield, 467 U.S. at 633, 104 S.Ct. at 2617. However, as the Hayfield Court made clear, the ICC may extend its jurisdiction and impose post-abandonment conditions when it is expressly authorized to do so by statute. Hayfield, 467 U.S. at 633, 104 S.Ct. at 2617. Thus, under 49 U.S.C. § 10906, it may postpone abandonment for up to 180 days after the issuance of a certificate of abandonment. Nevertheless, when no such condition is imposed, "`the disposition of rail property after an effective certificate of abandonment has been exercised is a matter beyond the scope of the [ICC's] jurisdiction....'" Hayfield, 467 U.S. at 634, 104 S.Ct. at 2617 (quoting Abandonment of Railroad Lines and Discontinuance of Service, 365 I.C.C. 249, 261 (1981)). In that event, "`[q]uestions of title to, and disposition of, the property are ... matters subject to state law.'" Id.

(iii) Congress' Development of a National Railbanking Policy

In the Railroad Revitalization and Regulatory Reform Act of 1976 ("4-R Act"), *1115 Pub.L. No. 94-210, 90 Stat. 31 (codified as amended at 45 U.S.C. §§ 801-855), Congress evidenced its concern over railroad abandonments and their consequent effect on the interstate rail network.[6] Under Section 809(a)(2) of the 4-R Act, it directed the Secretary of Transportation to prepare a report "evaluating the advantages of establishing a rail bank consisting of selected [abandoned railroad] rights-of-way" and discussing "interim uses for such rights-of-way." 90 Stat. 144, 145. In the ensuing report, the Secretary documented the validity of Congress' concern. United States Department of Transportation, Availability and Use of Abandoned Railroad Rights-of-Way (1977) ("Report"). In the previous seven years, rail carriers had either abandoned or had pending applications to abandon 21,000 miles of railroad track in the continental United States. Report, at 3. Moreover, the American Association of Railroads estimated that the nation's remaining 200,000 miles of track would be reduced by a further twenty percent over the next decade. Report, at 3. Not surprisingly, the Secretary concluded that abandoned railroad rights-of-way constitute a "significant problem," albeit one ripe for "opportunity." Report, at 3.
Under the 4-R Act, Congress also enacted substantive measures to alleviate the problem. Section 803, codified at 49 U.S.C. App. § 1654(f)-(o), directed the Secretary of Transportation to provide financial assistance to states for freight assistance programs designed to cover the continuation of rail service, the purchase of rail lines to maintain existing or to provide for future rail service, the rehabilitation and improvement of rail lines and the cost of reducing the costs of lost rail service in a manner less expensive than continuing rail service. Section 810 directed the Secretary of Transportation to establish a federal rail bank for the purpose of preserving existing service to areas in which fossil fuel natural resources or agricultural production are located.[7] Section 809(b) directed the Secretary of the Interior to provide financial assistance to all governmental entities "for programs involving the conversion of abandoned railroad rights-of-way to recreation and conservational uses...." Finally, Section 809(c), codified at 49 U.S.C. § 10906, required the ICC to consider whether railroad rights-of-way appropriate for abandonment would serve other public uses.
Although in his Report the Secretary of Transportation did not directly address interim trail use of a railroad right-of-way appropriate for abandonment, the final report of the Harbridge House regarding railbanking and from which the Secretary derived his Report, recognized that such "social benefits" as a "biking or hiking trail" could be realized from such a use. Harbridge House, Inc., Availability and Use of Abandoned Rights of Way III-11 (1977) ("Harbridge Report"). However, the Harbridge Report noted that such interim use would shift "the purpose of the rail bank from a passive custodial role to *1116 an active one, with attendant administrative and management problems". Harbridge Report, at III-11. Furthermore, it noted that such use might constitute an abandonment under state law. Harbridge Report, at IV-7. As a result, and since "railbanking itself is in a nascent stage," it discouraged a contemporaneous implementation of an interim use program. Harbridge Report, at III-12.

(iv) Section 1247(d)

Under § 1247(d), Congress granted interested parties the opportunity to use, for recreational purposes, and to preserve, for future rail service, railroad rights-of-way which have been approved for abandonment. Section 1247(d) provides that if interim trail use "is subject to restoration or reconstruction for railroad purposes" then such use "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." It also provides that if a qualified public or private entity is prepared to assume full responsibility for the management of the right-of-way and for any liability arising out of its transfer or use, the ICC "shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with [the National Trails System Act], and shall not permit abandonment or discontinuance inconsistent or disruptive of such use."
In its decision construing § 1247(d), and accompanying its issuance of final implementing rules, the ICC concluded that § 1247(d) applies only when a railroad voluntarily enters into an interim trail use agreement and only when the right-of-way is subject to future reconstruction and reactivation of rail service.[8]Rail Abandonments Use of Rights-of-Way as Trails, ___ I.C.C.2d ___ (served May 6, 1986). More specifically, it concluded that:
(a) Section 1247(d) does not give the [ICC] the power to condemn railroad rights-of-way for interim trail use and rail banking;
(b) Railroads and prospective interim trail users may voluntarily enter into agreements to use rights-of-way;
(c) Interim trail use under section 1247(d) is subject to reactivation of rail service by the owner of the right-of-way and subject to the interim user continuing to take full responsibility for liability in connection with trail use, and for managing and paying taxes on the rights-of-way; and
(d) Section 1247(d) preempts state laws that would otherwise result in extinguishment of easements for railroad purposes and reversion of rights-of-way to abutting landowners.
Rail Abandonments, slip op. at 6. In conformity with these conclusions, the ICC issued final implementing rules. 49 C.F.R. §§ 1105 and 1152.
Under its final rules, when the ICC finds that a railroad right-of-way is appropriate for abandonment under 49 U.S.C. § 10903 and when a qualified public or private entity offers to maintain the right-of-way for interim trail use, the ICC issues a CITU. The CITU permits the railroad to discontinue rail service, cancel tariffs and salvage track and other equipment. Rail Abandonments, slip op. at 17. It further provides the railroad and the prospective interim trail user 180 days to negotiate an interim trail use agreement. Rail Abandonments, slip op. at 17. If no agreement is reached, "then the CITU will convert into an effective certificate of abandonment, *1117 permitting the railroad to abandon the line immediately." Rail Abandonments, slip op. at 17. If, however, an agreement is reached, the ICC will permit interim trail use and hold in abeyance its authorization to abandon the right-of-way. Rail Abandonments, slip op. at 17. Should the trail user thereafter seek to terminate its use of the right-of-way, it must file a "petition to reopen the abandonment proceeding" so that the ICC may "issue a certificate of abandonment to the railroad and to the trail user." Rail Abandonments, slip op. at 17.
By enacting § 1247(d), Congress explicitly seeks to further "the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use" while at the same time to allow for interim trail use "in a manner consistent with [the National Trails System Act]." Indeed, and as the legislative history to § 1247(d) makes clear, Congress was acting out of concern over the failure of prior efforts to establish a "process through which railroad rights-of-way which are not immediately necessary for active service can be utilized for trail purposes." H.R. Rep. No. 98-28, 98th Cong., 1st Sess. 1, 8, reprinted in U.S.Code Cong. & Ad.News 1983, pp. 112, 119. Such prior efforts failed in large part because once a railroad right-of-way is abandoned and no longer subject to the ICC's jurisdiction, it usually reverts under state law to the owners of the fee underlying the railroad right-of-way and therefore cannot be conveyed by the railroad for a non-railroad purpose. See, e.g., Lawson v. State of Washington, 107 Wash.2d 444, 730 P.2d 1308 (1986); Schnabel v. County of DuPage, 101 Ill.App.2d 533, 57 Ill.Dec. 121, 428 N.E.2d 671 (1981); Pollnow v. Department of Natural Resources, 88 Wis.2d 350, 276 N.W.2d 738 (1979). Accordingly, "[t]he key finding of [§ 1247(d)] is that interim use of a railroad right-of-way for trail use, when the route itself remains intact for future railroad purposes, shall not constitute an abandonment of such rights-of-way for railroad purposes." H.R.Rep. No. 98-28, 98th Cong., 1st Sess. 1, 8, reprinted in U.S. Code Cong. & Ad.News pp. 112, 119. See also Baltimore & Ohio Railroad Co.-Exemption-Abandonment in Richland County, Ohio, ICC No. AB-19 (Sub.-No. 121X), served March 18, 1987 ("[t]he key purpose of section § 1247(d) is to preserve the status of a right-of-way as a line of railroad in order that it may remain intact for future railroad purposes by providing for interim trail use before abandonment occurs....").
As both the plain language of § 1247(d) and its legislative history indicate, § 1247(d) is designed to further the railbanking policies of the 4-R Act and to encourage the recreational and conservational policies of the National Trails System Act. It is intended to "protect railroad interests by providing that the right-of-way can be maintained for future railroad use even though service is discontinued and tracks removed" and to "assist recreational users by providing opportunities for trail use on an interim basis where such situation exists." H.R.Rep. No. 98-28, 98th Cong., 1st Sess. 1, 9, reprinted in U.S. Code Cong. & Ad.News 1983, pp. 112, 120. By serving both interests, it reflects, to borrow the words of the Secretary of Transportation, Congress' awareness that railroad abandonments constitute a "significant problem," ripe for "opportunity."

(v) Commerce Clause Analysis

Given Congress' "plenary" authority under the commerce clause, its enactment of the statutory abandonment framework, particularly 49 U.S.C. § 10906 which encourages alternate public uses of railroad rights-of-way which are abandoned but not railbanked, its underlying concern with the effect of railroad abandonments on the interstate rail network which gave rise to the 4-R Act, and its frustration over the failure of prior railbanking efforts, the Court can only conclude that Congress acted rationally *1118 in enacting § 1247(d) by electing to postpone railroad abandonments and to encourage interim trail use so as to further its railbanking purpose. The means selected are reasonably related to the end desired. State of Texas v. United States, 730 F.2d 339, 350 (5th Cir.), cert. denied, 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984). Here the Court's "relatively narrow" task in evaluating § 1247(d) under the commerce clause must conclude. Hodel, 452 U.S. at 276, 101 S.Ct. at 2360.
But plaintiffs and amici curiae would extend the Court's task still further. Specifically, they contend that the means chosen by Congress are particularly ineffective to achieve its railbanking purpose inasmuch as § 1247(d) would only effect five percent of all railroad rights-of-way which are proposed for abandonment and as its implementation rests on the railroad and the prospective trail user rather than on Congress or the ICC. See Plaintiffs' Memorandum in Opposition to Motion of the United States ... for Summary Judgment and to Supplement Plaintiffs' Previously Filed Memoranda in Support of their Motion for Summary Judgment at 7-15. Assuming the truth of their contention, it is of no avail. "[T]he effectiveness of existing laws in dealing with a problem identified by Congress is ordinarily a matter committed to legislative judgment." Hodel, 452 U.S. at 283, 101 S.Ct. at 2364. Here, as in Hodel, "Congress considered the effectiveness of existing laws and concluded that additional measures were necessary to deal with the interstate commerce effects" of railroad abandonments. Hodel, 452 U.S. at 283, 101 S.Ct. at 2364. It then responded, rationally, by enacting § 1247(d).

C. Impairment of the Obligation of Contracts and the Due Process Clause of the Fifth Amendment

Plaintiffs and amici curiae contend that § 1247(d) constitutes an impermissible impairment of the obligation of contracts under Article I, Section 10 of the United States Constitution and a violation of the due process clause under the fifth amendment of the United States Constitution. In essence, they contend that the right-of-way agreements entered into between plaintiffs' and M-K-T's predecessors in interest constitute contracts under state law and that such contracts are impaired to the extent that § 1247(d) interferes with plaintiffs' right to exercise full fee simple ownership over the rights-of-way. The Court finds that this argument is not meritorious.
At the outset, the Court notes that Article I, Section 10 applies only to state, not federal, legislation.[9]See Nachman Corp. v. Pension Benefit Guaranty Corp., 592 F.2d 947, 959 (6th Cir.), aff'd, 446 U.S. 559, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980); Speckmann v. Paddock Chrysler Plymouth, Inc., 565 F.Supp. 469, 473 (E.D.Mo. 1983). As § 1247(d) is a federal statute, analysis of plaintiffs' and amici curiae's claim under Article I, Section 10 is inappropriate. However, to the extent that they contend § 1247(d) unconstitutionally impairs a private contractual right, analysis under the due process clause of the fifth amendment is appropriate.
Under such an analysis, plaintiffs must demonstrate both that § 1247(d) alters contractual rights or obligations and, if an impairment is found, that it is of constitutional dimension. National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry., 470 U.S. 451, 105 S.Ct. 1441, 1455, 84 L.Ed.2d 432 (1985). If the alteration of contractual rights or obligations is minimal, the court's inquiry may end; if, however, it is substantial, the court must look more closely at the legislation. National R.R. Passenger Corp., 105 S.Ct. at 1455. The court's inquiry nevertheless remains limited. "The party asserting a Fifth Amendment due process violation must overcome a presumption of constitutionality *1119 and `establish that the legislature has acted in an arbitrary and irrational way.'" National R.R. Passenger Corp., 105 S.Ct. at 1455 (quoting Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 729, 104 S.Ct. 2709, 2717, 81 L.Ed. 2d 601 (1984)).
Assuming without deciding that the right-of-way agreements entered into between plaintiffs' and M-K-T's predecessors in interest created contractual rights in plaintiffs, and that these rights are substantially impaired by reason of § 1247(d), plaintiffs still cannot meet their burden of demonstrating that Congress acted in "an arbitrary and irrational way" when it enacted § 1247(d). As the discussion in Part B of this memorandum indicates, Congress acted rationally in enacting § 1247(d) by electing to postpone railroad abandonments and to encourage interim trail use so as to further its railbanking purpose. Accordingly, plaintiffs' claim under the due process clause of the fifth amendment must fail.

D. The Takings Clause of the Fifth Amendment

Plaintiffs and amici curiae seek a declaration that § 1247(d) is unconstitutional as applied to plaintiffs as it constitutes a taking of their property without just compensation.[10] Specifically, they contend that § 1247(d) constitutes a temporary regulatory taking of plaintiffs' property as it postpones the vesting of plaintiffs' reversionary interests in the M-K-T right-of-way without affording them an adequate remedy at law. As plaintiffs' request for equitable relief is inappropriate, and as they have an adequate remedy under the Tucker Act, 28 U.S.C. § 1491, the Court finds their argument lacking in merit.
The fifth amendment provides in pertinent part that "... private property [shall not] be taken for public use, without just compensation." As its language indicates, and as the Supreme Court has frequently observed, the amendment "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." First English Evangelical Lutheran Church v. Los Angeles City, ___ U.S. ___, 107 S.Ct. 2378, 2385, 96 L.Ed.2d 250 (1987) (citations omitted). Its purpose is "not to limit ... governmental interference with property rights per se"; rather, it is "to secure compensation" in the event such interference occurs. First English, 107 S.Ct. at 2386. Thus when the government effectuates a taking it "necessarily implicates the `constitutional obligation to pay just compensation.'" First English, 107 S.Ct. at 2386 (quoting Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)). Moreover, the amendment does not require that just compensation be paid in advance of, or contemporaneously with, the taking. Ruckleshaus v. Monsanto Co., 467 U.S. 986, 1016, 104 S.Ct. 2862, 2879-80, 81 L.Ed. 2d 815 (1984). All that it requires is that a "`reasonable, certain and adequate provision for obtaining compensation'" exist at the time of the taking. Regional Rail *1120 Reorganization Act Cases, 419 U.S. 102, 124-25, 95 S.Ct. 335, 349, 42 L.Ed.2d 320 (1974) (quoting Cherokee Nation v. Southern Kansas R.R., 135 U.S. 641, 659, 10 S.Ct. 965, 971, 34 L.Ed. 295 (1890)).
Accordingly, and so long as a suit for compensation may be brought subsequent to the taking, equitable relief is not available to enjoin the government, duly authorized by law, from taking private property for a public use. Monsanto, 467 U.S. at 1016, 104 S.Ct. at 2879-80 (citing Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 697 n. 18, 69 S.Ct. 1457, 1465, n. 18, 93 L.Ed. 1628 (1949)). When, as in this instance, property owners allege the United States has taken their property, compensation must ordinarily be sought in the United States Claims Court under the Tucker Act, 29 U.S.C. § 1491.[11]Monsanto, 467 U.S. at 1016, 104 S.Ct. at 2879-80 (citations omitted). If the property owners do not avail themselves of their remedy under the Tucker Act, and if that remedy is an adequate one, their taking claims are premature. Monsanto, 467 U.S. at 1019, 104 S.Ct. at 2881.
Plaintiffs and amici curiae contend that the Claims Court is without authority to award plaintiffs compensation as § 1247(d) does not contain any congressional authority, express or implied, for a particular taking claim. See, e.g., Southern California Financial Corporation v. United States, 634 F.2d 521, 225 Ct.Cl. 104 (1980). Accordingly, and as plaintiffs do not have an adequate remedy under the Tucker Act, they contend § 1247(d) should be declared unconstitutional. Their contention is severely flawed.
In determining whether a remedy is available for claims arising out of a taking pursuant to a federal statute, "the proper inquiry is not whether the statute `expresses an affirmative showing of a congressional intent to permit recourse to a Tucker Act remedy,'" but, rather, "`whether Congress has in the [statute] withdrawn the Tucker Act grant of jurisdiction to the [Claims Court]....'" Monsanto, 467 U.S. at 1017, 104 S.Ct. at 2880 (quoting Regional Rail Reorganization Act Cases, 419 U.S. at 126, 95 S.Ct. at 350). Indeed, and as previously noted, when the government effectuates a taking, it has impliedly promised to pay just compensation and has afforded a remedy for its recovery by a suit under the Tucker Act. Yearsley v. Ross Construction Co., 309 U.S. 18, 21, 60 S.Ct. 413, 414-15, 84 L.Ed. 554 (1940).
Altogether absent in § 1247(d) or its legislative history is a discussion of the interaction between § 1247(d) and the Tucker Act. As the Tucker Act grants the Claims Court "jurisdiction to render judgment upon any claim against the United States founded ... upon the Constitution," this Court would have to infer a withdrawal of jurisdiction with respect to takings under § 1247(d) either from the structure of the statute or its legislative history. Such a withdrawal of jurisdiction would amount to a partial repeal of the Tucker Act. Monsanto, 467 U.S. at 1017, 104 S.Ct. at 2880. As the Supreme Court has often recognized, however, "repeals by implication are disfavored." Monsanto, 467 U.S. at 1017, 104 S.Ct. at 2880 (citations omitted). Moreover, if § 1247(d) and the Tucker Act are "`capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard *1121 each as effective.'" Regional Rail Reorganization Act Cases, 419 U.S. at 133-34, 95 S.Ct. at 353 (quoting Morton v. Mancari, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974)).
Plaintiffs and amici curiae argue that Congress withdrew the Tucker Act remedy in § 1247(d), as it failed to include any provision for compensation in § 1247(d) and expressly declined to appropriate any funds for the acquisition of land for the Lewis and Clark National Historic Trail in 16 U.S.C. § 1249(c)(1), which they allege in conclusional fashion includes the M-K-T right-of-way. These arguments are unavailing. First, and as discussed above, the fact that Congress failed to include any provision for compensation in § 1247(d) is of no import, as it has "impliedly promised" to pay just compensation via the Tucker Act if the government is found to have effectuated a taking. Second, and as the Interest Groups have amply demonstrated in their responsive memoranda, the M-K-T right-of-way is not now a part of the Lewis and Clark National Historic Trail.[12]
As discussed in Part B of this memorandum, the "key finding" of § 1247(d) is that interim trail use of railroad rights-of-way which are authorized for abandonment and which are subject to future reactivation of rail service "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." See H.R.Rep. No. 98-28, 98th Cong., 1st Sess. 1, 8, reprinted in U.S.Code Cong. & Ad.News 1983, pp. 112, 119. In making such a finding, Congress did not address the liability of the United States to pay just compensation if a taking be found to have occurred. Congress either did not believe that the postponement of a railroad's abandonment of a right-of-way constituted a taking or assumed that the general grant of jurisdiction under the Tucker Act would provide a necessary remedy for any taking that might be found to have occurred. In either event, Congress' failure to address the issue cannot be construed to reflect an unambiguous intention to withdraw the Tucker Act remedy. Accordingly, as plaintiffs have failed to avail themselves of the Tucker Act remedy, the Court dismisses their taking claims as premature. See Monsanto, 467 U.S. at 1019, 104 S.Ct. at 2881.
In a closely-related argument, plaintiffs and amici curiae contend that Missouri, acting through its agent DNR, effectuated a taking of plaintiffs' property without just compensation within the meaning of the fourteenth amendment.[13] The Court refuses to find such a taking. First, because they have altogether failed to come forward with any authority to demonstrate that a state, acting pursuant to a lawfully enacted federal statute, may be found to have taken property without just compensation. Second, and even if they could make such a demonstration, they have failed to show, as they are required to do if this Court is to review their claim, that they have sought compensation through the procedures provided by the state for obtaining such relief. See Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, *1122 105 S.Ct. 3108, 3117-121, 87 L.Ed.2d 126 (1985); First English, 107 S.Ct. at 2389 n. 10.

E. The State Law Claims

Plaintiffs and amici curiae contend that § 1247(d) violates numerous state constitutional and statutory provisions as well as state common law. Specifically, and insofar as pertinent to the Court, they contend § 1247(d) violates the due process clause contained in Article I, Section 10 of the Missouri Constitution, the impairment of the obligation of contracts clause contained in Article I, Section 13 of the Missouri Constitution and state property law. Upon a review of the arguments advanced by the parties, the Court finds that the state laws referred to above are preempted by federal law.
As the Supreme Court recently observed, the circumstances under which federal law may be said to preempt state law are familiar. Schneidewind v. ANR Pipeline Co., ___ U.S. ___, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988). Congress may either explicitly define the extent to which its enactments preempt state law, or, in the absence of explicit statutory language, implicitly indicate an intent to occupy a given field to the exclusion of state law. Schneidewind, 108 S.Ct. at 1150. If Congress has not entirely displaced state law in a particular field, state law is preempted when it actually conflicts with federal law. Schneidewind, 108 S.Ct. at 1150. "Such a conflict will be found `when it is impossible to comply with both state and federal law, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress, Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).'" Schneidewind, 108 S.Ct. at 1150-51 (citations omitted).
In this case, § 1247(d) by its express terms preempts state law insofar as that law would permit reversion of the M-K-T right-of-way to plaintiffs while the right-of-way is being used on an interim basis as a trail. Moreover, § 1247(d) is an adjunct to a federal regulatory scheme which the Supreme Court has viewed as plenary, exclusive and preemptive. See, e.g., Chicago & N.W. Transportation Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981). Upon review, the Court concludes that the applicable state law would interfere with the federal objective of preserving railroad rights-of-way for future rail service through interim trail use and is therefore preempted. Plaintiffs and amici curiae have not presented any colorable arguments which would lead to a contrary conclusion.

ORDER AND JUDGMENT
Pursuant to the memorandum filed herein on this date,
IT IS HEREBY ORDERED that plaintiffs' motion for summary judgment be and it is denied.
IT IS FURTHER ORDERED that defendants Missouri-Kansas-Texas Railroad Company, Department of Natural Resources and Frederick A. Brunner's motion for summary judgment, defendants Conservation Federation of Missouri, et al.'s motion for judgment on the pleadings or, in the alternative, for summary judgment, and defendant United States of America's motion for partial summary judgment be and they are granted.
In light of the foregoing,
IT IS HEREBY ORDERED, ADJUDGED and DECREED that judgment in this action be and it is entered in favor of defendants and against plaintiffs. Accordingly, the Court declares 16 U.S.C. § 1247(d) constitutional.
NOTES
[1] Although § 1247(d) was enacted in a single paragraph, it is useful to separate its three sentences:

[1] The Secretary of Transportation, the Chairman of the Interstate Commerce Commission, and the Secretary of the Interior, in administering the Railroad Revitalization and Regulatory Reform Act of 1976 ... shall encourage state and local agencies and private interests to establish appropriate trails using the provisions of such programs.
[2] Consistent with the purposes of that Act, and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.
[3] If a state, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Commission shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use.
[2] The Interest Groups are the Conservation Federation of Missouri, the National Wildlife Federation, the Rails to Trails Conservancy, the Lewis and Clark Nature Trail Foundation, the Sierra Club, the Paralyzed Veterans of America, BICYCLE USA, the Lewis and Clark Heritage Foundation, the American Hiking Society, the Katy Missouri River Trail Association and the American Rivers Conservation Council.
[3] The American Farm Bureau Federation and the Missouri Farm Bureau Federation have also filed as amici curiae a memorandum in support of plaintiffs' motion for summary judgment.
[4] Indeed, the argument is somewhat abstruse. First, it assumes that § 1247(d) can only be sustained under the commerce clause if the Court finds that Congress' sole purpose in enacting § 1247(d) was to further its "railbanking" goals. But the Court is of the view that § 1247(d) might also be sustained as a means of furthering the recreational and conservational goals of the National Trails System Act. Second, it asks the Court to hold the statute unconstitutional on the basis of an alleged illicit legislative motive despite the "familiar principle of constitutional law that [a] court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." United States v. O'Brien, 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968). Nevertheless, as the parties have addressed the argument within the framework of plaintiffs and amici curiae's analysis, the Court shall do the same.
[5] The procedures a railroad must follow in seeking ICC approval are set forth in 49 U.S.C. § 10904.
[6] Congress' concern was not new. In enacting the Regional Rail Reorganization Act of 1973 ("3-R Act"), Pub.L. No. 93-236, 87 Stat. 985 (codified as amended at 45 U.S.C. §§ 701-797m), Congress was responding to the bankruptcy of certain railroads in the northeast and midwest regions of the country which it believed threatened the national welfare. See State of Texas v. United States, 730 F.2d 339, 344 (5th Cir.), cert. denied, 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984). The legislation created the United States Railway Association and directed it to develop a plan for the reorganization of railroads in the northeast and midwest into an economically viable rail transportation system. Harbridge House, Inc., Availability and Use of Abandoned Rights of Way 1 (1977). One of the goals of the plan was "the preservation ... of existing patterns of service by railroads (including short-line and terminal railroads), and of existing railroad trackage in areas in which fossil fuel natural resources are located...." Section 206(a), 87 Stat. 994.
[7] In his Report, the Secretary was concerned that § 803 and § 810 created two distinct rail banking programs which were not wholly consistent with one another and which were separately administered by the states and the federal government. Report at 37. His concern was that such concurrent administration "would create confusing and complex administrative problems." Id. In the Local Rail Service Assistance Act of 1980, Pub.L. No. 95-607, 92 Stat. 3064, Congress repealed § 810.
[8] The Court of Appeals for the Ninth Circuit has subsequently upheld the ICC's interpretation of § 1247(d) as requiring a voluntary agreement between the abandoning railroad and the prospective interim trail user. See Washington State Dept. of Game v. I.C.C., 829 F.2d 877 (9th Cir.1987).
[9] Article I, Section 10 provides in pertinent part: "No State shall ... pass any ... law impairing the Obligation of Contracts." (emphasis added).
[10] To the extent plaintiffs and amici curiae's claim may be construed as a facial challenge to § 1247(d), it is without merit. Under such a challenge, the only issue before the Court is whether the "mere enactment of § 1247(d) constitutes a taking." Hodel, 452 U.S. at 295, 101 S.Ct. at 2370 (citation omitted). The mere enactment of a statute does not effect a taking of property if it advances legitimate governmental interests and if it does not deny an owner economically viable use of his property. Agins v. Tiburon, 447 U.S. 255, 260-63, 100 S.Ct. 2138, 2141-43, 65 L.Ed.2d 106 (1980). First, § 1247(d) clearly advances legitimate governmental interests. Second, it will not deny an owner economically viable use of his property in all situations. For instance, a railroad which owns a fee interest in a right-of-way may wish to enter into an agreement with a prospective interim trail user so as to relieve itself of its financial obligations to maintain the right-of-way until it is ready to resume service on the right-of-way or to sell it to another rail carrier. No taking would occur here as the railroad is neither obligated to enter into negotiations with a prospective trail user nor obligated to enter into an agreement with it.
[11] The Tucker Act, 28 U.S.C. § 1491, provides in pertinent part:

The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
The Supreme Court has held that "[i]f there is a taking, the claim is `founded upon the Constitution' and within the jurisdiction of the [Claims Court] to hear and determine." United States v. Causby, 328 U.S. 256, 267, 66 S.Ct. 1062, 1068-69, 90 L.Ed. 1206 (1946). However, the district courts also have concurrent jurisdiction to consider all claims against the United States which are "founded upon the Constitution" and which do not exceed $10,000 in amount.
[12] Plaintiffs and amici curiae's reliance on Southern California Financial Corp. v. United States, 634 F.2d 521 (Cl.Ct.1980) is likewise misplaced. Here the Claims Court reversed a trial court's award of damages against the United States in an inverse condemnation suit. Plaintiffs alleged that the Air Force, by means of successive renewable leases, had permanently taken their property for the purpose of storing bombs and ammunition. Under the Military Construction Appropriation Act, the Air Force was required to obtain the approval of Congress for land acquisitions in excess of $50,000. Southern Cal., 634 F.2d at 523. The Air Force failed to do so. As the Claims Court reasoned, "[t]he Air Force could not attain the same result by camouflaging a larger taking in the guise of successive renewable leases which were not reviewable by Congress." Southern Cal., 634 F.2d at 524. Thus in Southern Cal., unlike here, there was no "congressional authorization, express or implied, for the particular taking." Southern Cal., 634 F.2d at 523.
[13] The fifth amendment takings clause applies to the states through the fourteenth amendment. See Chicago, B. & Q. R.R. v. Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897).